## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MATTHEW J. SZULIK, individually and as trustee of the Raymond W. Szulik Trust, RAYMOND W. SZULIK, as trustee of the Raymond W. Szulik Trust, EDWARD ADAMS, as trustee of the Kaitlin Szulik Trust, Brendan Szulik Trust and Keenan Szulik Trust, and KYLE M. SZULIK,<br><br>    Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>    Defendant. | Civil Action No. _____ |

## COMPLAINT

To safeguard their investment funds from misuse, the plaintiffs engaged the defendant and its predecessors to act as an independent custodian pursuant to a series of custodial agreements that established the limited and specific circumstances in which the defendant could transfer funds to the plaintiffs' financial advisor.  This is an action by the plaintiffs against the defendant for breach of contract, negligence, unjust enrichment and breach of fiduciary duty arising from the defendant's disregard of these custodial obligations and the subsequent financial harm caused to the plaintiffs when its financial advisor manipulated the defendant's lack of oversight to make unauthorized and illegal investments.

## PARTIES

1.      The plaintiffs, Matthew J. Szulik and Kyle M. Szulik, are individuals who reside in Raleigh, North Carolina as husband and wife.

2.      Raymond W. Szulik (Matthew's father) is an individual who resides in Raleigh, North Carolina.  Matthew and Raymond Szulik are the current trustees of the Raymond W. Szulik Trust (for the benefit of Raymond Szulik) (the "Raymond Trust").

3.      Edward Adams is an individual who resides in Richmond, Vermont.  Edward Adams is the current trustee of the Kaitlin Szulik Trust (for the benefit of the Matthew and Kyle Szulik's daughter), the Brendan Szulik Trust (for the benefit of Matthew and Kyle Szulik's son), and the Keenan Szulik Trust (for the benefit of Matthew and Kyle Szulik's son) (collectively, the "Szulik Children Trusts").[1]

4.      The defendant, State Street Bank and Trust Company ("State Street"), is a trust company duly organized and existing under the laws of the Commonwealth of Massachusetts that maintains its principal place of business at One Lincoln Street, Boston, Massachusetts.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the action involves a dispute between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is properly based in this District pursuant to 28 U.S.C. § 1391(a) because State Street resides in this District, a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this District, and State Street is subject to personal jurisdiction in this District.

---

[1] The term "Szuliks" will be used in this complaint to refer collectively to: (i) Matthew J. Szulik; (ii) Kyle M. Szulik; (iii) the Raymond Trust, its trustees and its beneficiaries; and (iv) the Szulik Children Trusts, its trustees and its beneficiaries.

## FACTUAL ALLEGATIONS

### The Szulik Custody Accounts

7.      From approximately 1996 until 2009, TAG Virgin Islands, Inc. (formerly Taurus Advisory Group, LLC) (collectively, "TAG") was employed by the Szuliks to manage various family investment portfolios that at various times in combination exceeded $80 million in value.

8.      To safeguard their assets from misappropriation and/or misuse by TAG, the Szuliks entered into a series of custodial agreements with State Street and/or predecessors of State Street in order to establish the limited, specific circumstances under which TAG could disburse or transfer the assets held in custody by State Street and to ensure that the Szuliks' assets would always be held in the custody of a qualified custodian that was totally independent of TAG.

9.      On or around March 6, 1996, Matthew and Kyle Szulik entered into a Custody Services Custodian Account Agreement with Chemical Bank, a predecessor to State Street, which created a joint custodial account (the "Joint Custodial Account") in their names for the purpose of safeguarding from misappropriation and/or misuse the investment assets managed by TAG for the benefit of the Szuliks ("the Joint Account Agreement").  A true and accurate copy of the Joint Account Agreement is attached hereto as Exhibit A.

10.      Upon information and belief, State Street succeeded to the rights, obligations and liabilities of Chemical Bank set forth in the Joint Account Agreement as a result of one or more corporate mergers or acquisitions.

11.      On or around December 23, 2004, Matthew and Raymond Szulik entered into a Custody Account Agreement with Investors Bank & Trust Company ("Investors"), a predecessor to State Street, which created a custodial account (the "Raymond Custodial Account") for the purpose of safeguarding from misappropriation and/or misuse the investment assets managed by

TAG for the benefit of the Raymond Trust ("the Raymond Account Agreement").  A true and accurate copy of the Raymond Account Agreement is attached hereto as Exhibit B.

12.     Upon information and belief, State Street succeeded to the rights, obligations and liabilities of Investors set forth in the Raymond Account Agreement as a result of one or more corporate mergers or acquisitions.

13.     On or around July 1, 2008, the then-trustee of the Szulik Children Trusts entered into a series of identical Custody Account Agreements with State Street which created three custodial accounts (the "Szulik Children Custodial Accounts") for the purpose of safeguarding from misappropriation the investment assets managed by TAG for the benefit of the Szulik Children Trusts ("the Szulik Children Agreements").  True and accurate copies of the Szulik Children Agreements are attached hereto as Exhibits C through E.

14.     The Joint Account and Raymond Account Agreements permitted Chemical and Investors Bank to charge a custodial fee equal to five basis points (0.0005) annually, payable quarterly in arrears.  The Szulik Children Agreements permitted State Street to charge a custodial fee based on a custodian fee schedule in effect from time to time that, upon information and belief, was calculated as a percentage of the total assets held by State Street in the Szulik Children Custodial Accounts.

15.     The Joint Account, Raymond Account and Szulik Children Agreements (collectively, the "Custody Agreements") authorized State Street to disburse funds from the Joint, Raymond and Szulik Children Custodial Accounts (collectively, the "Szulik Accounts") in exchange for the timely receipt of securities in good form.

16.     When State Street disbursed funds from the Szulik Accounts in exchange for the timely receipt of securities in good form, it was required by the Custody Agreements to itself

take custody of those securities, or to deposit all or any part of the securities received with a suitably qualified and independent subcustodian.

**State Street Disburses Funds From the**
**Szulik Accounts in Exchange for Worthless Paper**

17.     During the period of time that the Custody Agreements were in force, TAG began to liquidate the conservative investments in high-quality stocks and bonds held in the Szulik Accounts, and placed much of those funds in suspect, high-risk, illiquid securities, as well as real estate and personal loan instruments, that were incompatible with the Szuliks' investment goals. TAG often accepted illegal kickbacks and other financial benefits as consideration for making these investments.  The Szuliks ultimately were defrauded out of millions of dollars as a result of TAG's illegal investments.

18.     In furtherance of this scheme, TAG would from time to time instruct State Street to disburse funds from the Szulik Accounts so that TAG could utilize those funds for various purposes that were impermissible under the Custody Agreements.

19.     Despite State Street's limited authority under the Custody Agreements to disburse the Szuliks' funds in exchange for the timely receipt of securities in good form, State Street made numerous disbursements to TAG in exchange for securities that not only were not in good form as matter of law and accepted business usage, but had no value whatsover.

20.     For example, on at least one occasion State Street disbursed $200,000 worth of the Szuliks' funds from the Joint Custodial Account in exchange for a purported promissory note issued by International Equine Acquisitions Holdings, Inc. ("International Equine"), as maker, that was not in good form because it was *not signed*.

21.     In other instances, State Street disbursed at least $1.975 million worth of the Szuliks' funds from the Joint Custodial Account in exchange for purported promissory notes

issued by International Equine, as maker, that were not in good form because they were *executed by the President of TAG*. Not only did the signors of these purported promissory notes not have authority to bind International Equine, but the signors did not even purport to execute the note on behalf of International Equine.

22.     Upon information and belief, State Street disbursed the Szuliks' funds on other occasions in exchange for securities that were not, on their face, in good form as a matter of law and accepted business usage.

**State Street Disburses the Szuliks'**
**Funds Without Receiving Any Value in Return**

23.     In furtherance of its scheme to defraud the Szuliks, TAG would from time to time instruct State Street to disburse funds from the Szuliks Accounts so that TAG could utilize those funds to purchase shares of stock from illiquid and thinly-traded companies.

24.     Despite State Street's obligation under the Custody Agreement to take timely custody of any security received in exchange for a disbursement of the Szuliks' funds, State Street failed to take timely possession of these illiquid shares purchased by TAG.

25.     For example, State Street disbursed at least $18 million worth of funds from the Joint Custodial Account for the purpose of purchasing stock in Conversion Services International, Inc. ("Conversion Services"). State Street, however, disbursed some or all of these funds without taking timely possession of Conversion Services share certificates. This failure to take timely possession of the share certificates is evidenced by fact that State Street did not list the certificates on the account statements sent to the Szuliks at the time the investments were purportedly made, and by the fact that Conversion Services continued to issue, and State Street continued to receive, newly-issued share certificates more than two years after TAG made the last investment in Conversion Services.

26.     Upon information and belief, State Street made additional disbursements of the Szuliks' funds to TAG for the purpose of purchasing shares of stock from other companies that were not taken into custody by State Street or a qualified custodian on a timely basis.

**State Street Fails to Take**
**Proper Custody of the Szuliks' Assets**

27.     Upon information and belief, State Street charged custodian fees based on the value of all of the assets listed on the account statements that it issued for the Szulik Accounts, confirming that State Street was responsible for all such listed assets.

28.     Despite the clear requirements in the Custody Agreements obligating State Street or a qualified and independent subcustodian to take timely custody of any security received in exchange for a disbursement of the Szuliks' funds, many of the account statements issued by State Street reflect that the Szuliks' assets were held in some other form of custody.

29.     For example, by December 2008 over $23 million worth of securities in the Joint Custodial Account were not held in custody by State Street.  Rather, these securities were designated on State Street account statements with an "R" to indicate that the holding was not held in custody at State Street.  Upon information and belief, many of these securities were being held by TAG, entities associated with TAG, or other persons or entities who were not suitably qualified or independent of TAG.

30.     Upon information and belief, State Street at additional times permitted TAG to maintain custody of securities that were purchased with funds disbursed from the Szulik Accounts.

**State Street Misreported**
**the Value of the Szuliks' Assets**

31.     On its monthly statements, State Street misreported the value of many of the Szuliks' assets.

7

32.     For example, State Street from time to time listed purported promissory notes issued by International Equine as maker at "par value," despite the fact that these purported notes were unsigned and/or signed only by TAG, were not in good form as a matter of law or accepted business usage, and were therefore worthless scraps of paper that did not have any value.

33.     In other instances, State Street also listed at par value promissory notes which had long since defaulted, and whose value should have been heavily, if not entirely, discounted.

34.     State Street ultimately acknowledged its misvaluation of the assets in the Szulik Accounts.  Beginning in approximately February 2010, State Street began to include a new disclaimer in its account statements that had never before been included in prior statements, in which it admitted that "[i]nformation provided on this account statement in connection with such held at source assets was not provided or verified for accuracy by State Street.  These assets are displayed for informational purposes only."  Then, in an April 28, 2011 letter, State Street acknowledged that prior account statements had assigned value to securities that State Street was no longer comfortable valuing, and that, as a result, future account statements would no longer assign value to those securities.

**State Street Listed Phony CUSIP**
**Numbers on Its Monthly Statements**

35.      CUSIPs are unique, 9-character alphanumeric identifiers assigned by Standard & Poor's to North American securities to facilitate the clearing and settlement of trades.  The CUSIP distribution system is owned by the American Bankers Association and is operated by Standard & Poor's.  A CUSIP number is the hallmark of a legitimate domestic security.

36.     State Street monthly statements listed CUSIP numbers for all of the Szuliks' securities, lending the impression that all of the Szuliks' holdings were legitimate securities that had been assigned CUSIP numbers by Standard & Poor's.

37.     Contrary to State Street's representation that all of the Szuliks' securities had been issued CUSIP numbers, in truth many of the Szuliks' securities did not have CUSIP numbers assigned to them, including, upon information and belief, the International Equine purported promissory notes.

**State Street Disbursed the Szuliks'**
**Funds in Facially Irregular Transactions**

38.     State Street disbursed the Szuliks' funds in a number of transactions that were so facially irregular that Street Street should not have disbursed any funds without first taking further steps to assure itself that the transaction was legitimate.

39.     For example, in 2006 State Street transferred at least $8,655,000 from the joint custody account to attorney Barry Feiner for the purported purchase of securities.  Such transfers are so irregular on their face that State Street should have refused to make them without taking further steps to assure itself that the transaction was legitimate.

40.     Upon information and belief, had State Street conducted the required further inquiry into these transactions, it would have learned that these transactions were fraudulent.

**State Street Collects Excessive Custodian**
**Fees Based on Value of Worthless Securities**

41.     As set forth above, the Custody Agreements permitted State Street to collect a custodian fee that was calculated as a percentage of the total assets held by State Street in the Szulik Accounts.

42.     State Street charged excessive custodial fees under the Custody Agreements by calculating those fees, in part, based on securities that were either defaulted or not in good form, and were therefore worthless.

43.     For example, the account statement issued in connection with the Joint Custodial Account on October 31, 2007 indicates that State Street charged a custodial fee calculated by

reference to assets in custody in the amount of approximately $80 million. However, this statement included as assets approximately $2.8 million worth of defaulted promissory notes whose maturity dates had passed long before October 31, 2007. Because these defaulted promissory notes were worthless, they should not have been included in State Street's calculation of the custodial fee.

44.     Upon information and belief, State Street collected other excessive custodial fees from the Szuliks by inflating the value of their accounts with securities that were either defaulted or not in good form.

## COUNT I
### (Breach of Contract - Joint Account Agreement)

45.     The plaintiffs reallege and incorporate by reference herein paragraphs 1 through 44, above.

46.     The Joint Account Agreement is a valid and enforceable contract between Matthew and Kyle Szulik and State Street.

47.     Matthew and Kyle Szulik have fully performed their obligations under the Joint Account Agreement.

48.     State Street breached the Joint Account Agreement by negligently and/or willfully disbursing the Szuliks' funds in exchange for securities that, on their face, were not in good form as a matter of law and accepted business usage.

49.     State Street breached the Joint Account Agreement by negligently and/or willfully disbursing the Szuliks' funds for the purpose of purchasing shares of stock that were not transferred to the Joint Custodial Account on a timely basis.

50.     State Street breached the Joint Account Agreement by negligently and/or willfully disbursing the Szuliks' funds without taking custody of the securities received in exchange or entrusting those securities to a qualified and suitably independent subcustodian.

51.     State Street breached the Joint Account Agreement by negligently and/or willfully misreporting the value of the Szuliks' asssets.

52.     State Street breached the Joint Account Agreement by negligently and/or willfully listing phony CUSIP numbers on account statements.

53.     State Street breached the Joint Account Agreement by negligently and/or willfully disbursing the Szuliks' funds in facially irregular transactions.

54.     State Street breached the Joint Account Agreement by negligently and/or willfully charging excessive custodial fees on the basis of inflated asset value.

55.     As a direct and proximate result of the foregoing, the Szuliks have suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT II
### (Breach of Contract - Raymond Trust and Szulik Children Trust Agreements)

56.     The plaintiffs reallege and incorporate by reference herein paragraphs 1 through 55, above.

57.     The Raymond Trust Agreement is a valid and enforceable contract between the Raymond Trust and State Street.

58.     The Szulik Children Trust Agreements are valid and enforceable contracts between the Szulik Children Trusts and State Street.

59.     The Szuliks, Raymond Trust, and Szulik Children Trusts have fully performed their obligations under the Raymond Trust and Szulik Children Trust Agreements.

60.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by disbursing the Szuliks' funds in exchange for securities that, on their face, were not in good form as a matter of law and accepted business usage.

61.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by disbursing the Szuliks' funds for the purpose of purchasing shares of stock that were not transferred to the Custody Accounts on a timely basis.

62.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by disbursing the Szuliks' funds without taking custody of the securities received in exchange or entrusting those securities to a qualified and suitably independent subcustodian.

63.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by misreporting the value of the Szuliks' assets.

64.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by listing phony CUSIP numbers.

65.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by disbursing the Szuliks' funds in facially irregular transactions.

66.     State Street breached the Raymond Trust Agreement and Szulik Children Trust Agreements through gross negligence and/or willful misconduct by charging excessive custodial fees on the basis of inflated asset value.

67.     As a direct and proximate result of the foregoing, the Szuliks, Raymond Trust and Szulik Children Trusts have suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT III
### (Negligence)

68.     The plaintiffs reallege and incorporate by reference herein paragraphs 1 through 67, above.

69.     State Street owed a duty of care to the Szuliks to maintain their assets in a manner that would safeguard against misappropriation or misuse by TAG.

70.     State Street breached the duty of care it owed to the Szuliks by disbursing the Szuliks' funds in exchange for securities that, on their face, were not in good form as a matter of law and accepted business usage.

71.     State Street breached the duty of care it owed to the Szuliks disbursing the Szuliks' funds for the purpose of purchasing shares of stock that were not transferred to the Custody Accounts on a timely basis.

72.     State Street breached the duty of care it owed to the Szuliks by disbursing the Szuliks' funds without taking custody of the securities received in exchange or entrusting those securities to a qualified and suitably independent subcustodian.

73.     State Street breached the duty of care it owed to the Szuliks by misreporting the value of the Szuliks' asssets.

74.     State Street breached the duty of care it owed to the Szuliks by listing phony CUSIP numbers.

75.     State Street breached the duty of care it owed to the Szuliks by disbursing the Szuliks' funds in facially irregular transactions.

13

76.     State Street breached the duty of care it owed to the Szuliks by charging excessive custodial fees on the basis of inflated asset value.

77.     The foregoing breaches were the direct and proximate cause of damage to the Szuliks, Raymond Trust and Szulik Children Trusts.

78.     As a direct and proximate result of the foregoing, the Szuliks, Raymond Trust and Szulik Children Trusts have suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT IV**
**(Unjust Enrichment)**

79.     The plaintiffs reallege and incorporate by reference herein paragraphs 1 through 78, above.

80.     State Street collected custodian fees from the Szuliks, Raymond Trust and Szulik Children Trusts that were calculated improperly on the basis of asset values that had been inflated through the inclusion of defaulted promissory notes and securities that were not in good form on their face as a matter of law and accepted business usage.

81.     State Street was enriched by the retention of these excessive custodian fees at the expense of the Szuliks, Raymond Trust and Szulik Children Trusts.

82.     It is against the fundamental principles of justice, equity, and good conscience to permit State Street to retain these excessive custodian fees in these circumstances.

**COUNT V**
**(Breach of Fiduciary Duty)**

83.     The plaintiffs reallege and incorporate by reference herein paragraphs 1 through 82, above.

84.     State Street owed the Szuliks, Raymond Trust and Szulik Children Trusts fiduciary duties as a result of it taking custody of their assets.

14

85.     State Street breached the fiduciary duty it owed to the Szuliks by disbursing the Szuliks' funds in exchange for securities that, on their face, were not in good form as a matter of law and accepted business usage.

86.     State Street breached the fiduciary duty it owed to the Szuliks disbursing the Szuliks' funds for the purpose of purchasing shares of stock that were not transferred to the Custody Accounts on a timely basis.

87.     State Street breached the fiduciary duty it owed to the Szuliks by disbursing the Szuliks' funds without taking custody of the securities received in exchange or entrusting those securities to a qualified and suitably independent subcustodian.

88.     State Street breached the fiduciary duty it owed to the Szuliks by misreporting the value of the Szuliks' asssets.

89.     State Street breached the fiduciary duty it owed to the Szuliks by listing phony CUSIP numbers.

90.     State Street breached the fiduciary duty it owed to the Szuliks by disbursing the Szuliks' funds in facially irregular transactions.

91.     State Street breached the fiduciary duty it owed to the Szuliks by charging excessive custodial fees on the basis of inflated asset value.

92.     The foregoing breaches were the direct and proximate cause of damage to the Szuliks, Raymond Trust and Szulik Children Trusts.

93.     As a direct and proximate result of the foregoing, the Szuliks, Raymond Trust and Szulik Children Trusts have suffered, and will continue to suffer, damages in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs respectfully pray that this Court:

a. Enter judgment for the plaintiffs and against State Street on each of the counts listed above;

b. Award the plaintiffs damages against State Street in an amount to be determined at trial;

c. Award the plaintiffs disgorgement of all fees paid to State Street in connection with the plaintiffs' investment portfolio;

d. Award the plaintiffs pre-judgment interest, post-judgment interest, costs, accountant fees, expert fees and attorneys' fees; and

e. Grant the plaintiffs such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The plaintiffs respectfully request a trial by jury on all matters so triable.

Respectfully submitted,

MATTHEW J. SZULIK, individually and as trustee of the Raymond W. Szulik Trust, RAYMOND W. SZULIK, as trustee of the Raymond W. Szulik Trust, EDWARD ADAMS, as trustee of the Kaitlin Szulik Trust, Brendan Szulik Trust and Keenan Szulik Trust, and KYLE M. SZULIK,

By their attorneys,

/s/ Ralph T. Lepore, III
Ralph T. Lepore, III (BBO #294420)
Michael T. Maroney (BBO #653476)
Benjamin M. McGovern (BBO #661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
ralph.lepore@hklaw.com
michael.maroney@hklaw.com
benjamin.mcgovern@hklaw.com

Mitchell E. Herr (*pro hac application forthcoming*)
Tracy Nichols (*pro hac application forthcoming*)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 789-7736

Date: January 4, 2012

#10728582_v1