UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MATTHEW J. SZULIK, individually and as trustee of the Raymond W. Szulik Trust, RAYMOND W. SZULIK, as trustee of the Raymond W. Szulik Trust, EDWARD ADAMS, as trustee of the Kaitlin Szulik Trust, Brendan Szulik Trust and Keenan Szulik Trust, and KYLE M. SZULIK, | ) ) ) ) ) ) ) | |
| | ) | CIVIL ACTION |
| | ) | NO. 12-10018-NMG |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO DISMISS

February 6, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of five Custody Account Agreements which the plaintiffs,

Matthew J. Szulik, individually and as trustee of the Raymond W. Szulik Trust, Raymond

W. Szulik, as trustee of the Raymond W. Szulik Trust, Edward Adams, as trustee of the

Kaitlin Szulik Trust, Brendan Szulik Trust, and Keenan Szulik Trust, and Kyle M. Szulik

(collectively, the "Szuliks"), entered into with defendant State Street Bank and Trust

Company ("State Street") and its predecessors, Chemical Bank and Investors Bank &

Trust Company.  Pursuant to the Agreements, the plaintiffs authorized State Street and its

predecessors to establish and maintain custody accounts for the purpose of holding and disposing of cash and investments belonging to the plaintiffs, and to conduct certain transactions in accordance with instructions from the plaintiffs' investment advisor, TAG Virgin Islands, Inc. ("TAG").

The plaintiffs claim that during the time they maintained custody accounts with the defendant and its predecessors, TAG defrauded the Szuliks out of millions of dollars by liquidating their conservative investments in high-quality stocks and bonds, and investing their funds in suspicious, high-risk and illiquid securities, as well as in real estate and personal loan instruments, which were incompatible with the Szuliks' investments goals and for which TAG often received illegal kickbacks and other financial benefits. The plaintiffs contend that State Street, in its capacity as their custodian, was obligated to safeguard the Szuliks' property from misappropriation or misuse by TAG. However, they claim that instead of protecting the plaintiffs' assets, State Street engaged in conduct that violated its own contractual and legal duties to the Szuliks and enabled TAG to carry out its deceptive scheme. In particular, the Szuliks contend that State Street improperly disbursed the plaintiffs' funds in exchange for securities that were defective on their face and were not delivered to the plaintiffs in a timely manner, failed to take proper custody of the plaintiffs' assets, issued misleading and inaccurate account statements to the plaintiffs, and charged the plaintiffs excessive fees based on misleading and inflated account values. The plaintiffs allege that they have suffered and will continue to suffer damages as a result of State Street's alleged misconduct. By their Complaint in this

action, the plaintiffs have asserted claims against State Street for breach of contract (Counts I and II), negligence (Count III), unjust enrichment (Count IV), and breach of fiduciary duty (Count V).

The matter is presently before the court on "Defendant State Street Bank and Trust Company's Motion to Dismiss Plaintiffs' Complaint" (Docket No. 14), by which State Street is seeking an order dismissing each Count of the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6). For all the reasons described below, this court recommends to the District Judge to whom this case is assigned that the defendant's motion be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that the motion to dismiss be allowed with respect to Count V, but otherwise that the plaintiffs be permitted to proceed with the remaining claims in accordance with this Report and Recommendation.

## II.  <u>STATEMENT OF FACTS</u>

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences.  <u>See</u> <u>Cooperman v. Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir. 1999).  "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  <u>Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 267 F.3d 30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for

documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  Applying this standard to the instant case, the facts relevant to State Street's motion to dismiss are as follows.[1]

### The Parties

Plaintiff Matthew J. Szulik, his wife plaintiff Kyle M. Szulik, and Matthew's father, plaintiff Raymond W. Szulik, are individuals who reside in Raleigh, North Carolina.  (Compl. ¶¶ 1-2).  Matthew and Raymond are the trustees of the Raymond W. Szulik Trust, which was established for the benefit of Raymond Szulik.  (Id. ¶ 2). Plaintiff Edward Adams ("Adams") is an individual who resides in Richmond, Vermont. (Id. ¶ 3).  He is currently the trustee of three separate trusts – the Kaitlin Szulik Trust, the Brendan Szulik Trust, and the Keenan Szulik Trust (collectively, the "Szulik Children Trusts") – that were established for the benefit of Matthew and Kyle Szulik's children. (Id.).  As detailed below, the custodial accounts at issue in this case were established for the benefit of Matthew and Kyle Szulik jointly, the Raymond W. Szulik Trust, and each of the Szulik Children Trusts.

The defendant, State Street, is a trust company that is organized under the laws of the Commonwealth of Massachusetts and maintains a principal place of business in

---

[1]  The facts are derived from (1) the Complaint (Docket No. 1) ("Compl.") and the exhibits attached thereto ("Compl. Ex. __"); and (2) the exhibit attached to the Declaration of Eric D. Wolkoff, Esq., which is attached to the Defendant's Memorandum of Law in Support of its Motion to Dismiss the Complaint (Docket No. 15) ("Def. Ex. A").

Boston, Massachusetts.  (Id. ¶ 4).  The plaintiffs claim that State Street succeeded to the rights, liabilities and obligations of Chemical Bank and Investors Bank & Trust Company ("IBT") as a result of one or more corporate mergers or acquisitions.  (Id. ¶¶ 10, 12).  As the successor to Chemical Bank and IBT, State Street allegedly assumed responsibility as custodian of the plaintiffs' custody accounts with those entities.  (See id. ¶¶ 9-12).  By their claims in this action, the plaintiffs are seeking to hold State Street liable for the alleged misconduct of Chemical Bank and IBT, as well as for its own misconduct, in connection with the plaintiffs' custody accounts.[2]

### The Custody Account Agreements

During the time period from about 1996 until 2009, the Szuliks employed TAG[3] as their investment advisor to manage various family investment portfolios, which at certain times had a combined value of over $80 million.  (Id. ¶ 7).  In order to ensure that their assets would be held by a qualified custodian that was entirely independent from TAG, the plaintiffs entered into a series of custodial agreements (the "Custody Account Agreements") with State Street.  (Id. ¶ 8).  Specifically, Matthew and Kyle Szulik entered into a Custody Services Custodian Account Agreement with the defendant on or about March 6, 1996 for the purpose of establishing a custody account for the joint benefit of

---

[2] For purposes of this Report and Recommendation, this court has referred to both State Street and its predecessors as "State Street" or the "defendant."

[3] Before it became known as TAG Virgin Islands, Inc., TAG was known as Taurus Advisory Group, LLC.  (Compl. ¶ 7).  Because the name change is irrelevant to the issues raised by the motion to dismiss, this court has referred to that entity as "TAG" throughout this Report and Recommendation.

Matthew and Kyle Szulik (the "Joint Account Agreement"), and Matthew and Raymond Szulik entered into a Custody Account Agreement with the defendant on or about December 23, 2004 for the purpose of establishing a custody account for the benefit of the Raymond W. Szulik Trust (the "Raymond Trust Agreement").  (See Compl. ¶¶ 9,11; Compl. Ex. A at 1-2; Compl. Ex. B at 1).  In addition, on or about July 1, 2008, the then-trustee of the Szulik Children Trusts entered into three separate Custody Account Agreements with State Street in order to establish custody accounts for the benefit of the Szulik Children Trusts (the "Szulik Children Trust Agreements").  (See Compl. ¶ 13; Compl. Exs. C-E).  The plaintiffs claim that the intended purpose of those Agreements was to limit the circumstances under which TAG could disburse or transfer their assets, and to safeguard those assets from misappropriation or misuse by TAG.  (See id. ¶¶ 8-9, 11, 13). As described below, the plaintiffs contend that State Street's own misconduct and lack of oversight enabled TAG to defraud them out of millions of dollars worth of investments.

The details of the Custody Account Agreements will be described below in connection with this court's analysis.  However, as a general matter, under the Agreements the plaintiffs authorized State Street to establish custody accounts for the purpose of holding and disposing of property that State Street received for the plaintiffs.  (See Compl. Ex. A at preamble, Compl. Ex. B at preamble).[4]  They also authorized State Street

---

[4]  The Raymond Trust Agreement and the three Szulik Children Trust Agreements are identical in all material respects.  (See generally Compl. Exs. B through E).  Therefore, for ease of reference, this court has cited only to the Raymond Trust Agreement when describing the substance of those contracts.  The Raymond Trust Agreement can be found at Exhibit B to the

to perform various transactions in accordance with TAG's instructions, including but not limited to, transactions involving the disbursement of funds and the purchase and sale of securities.  (See Compl. Ex. A ¶ 12; Compl. Ex. B ¶ 23; Def. Ex. A ¶ 1).  In addition, the Agreements required State Street to issue periodic account statements describing the transactions in the custody accounts, and listing the securities held in the accounts along with the current market value of those securities, if available.  (See Compl. Ex. A ¶ 10; Compl. Ex. B ¶ 15).  The plaintiffs claim that State Street engaged in conduct which exceeded its contractual authority, and failed to carry out various duties and obligations that it owed to the Szuliks under the terms of the parties' Agreements.

The Custody Account Agreements set forth express limitations on State Street's liability to the custody account holder.  In particular, the Joint Account Agreement contained a provision entitled "Liability and Indemnification," which provided in relevant part as follows:

> You [the custodian] shall not be liable to any of the undersigned for any loss suffered by the undersigned (including reasonable attorney's fees) in connection with, arising out of, or in any way related to the transactions contemplated under this Agreement, unless such loss is caused by your negligence or willful misconduct.

(Compl. Ex. A ¶ 7 (emphasis added)).  Similarly, the Raymond Trust Agreement and the Szulik Children Trust Agreements contained a provision authorizing the defendant to rely on instructions from the plaintiffs or TAG, which provided in relevant part that

---

Complaint.  The Joint Account Agreement, which differs in substance from the remaining Custody Account Agreements, is attached as Exhibit A to the Complaint.

> [y]ou [the custodian] shall incur no liability to the undersigned or otherwise as a result of any act or omission by you in accordance with instructions on which you are authorized to rely pursuant to the provisions of this section <u>unless your reliance is the result of your gross negligence or willful misconduct</u>.

(Compl. Ex. B ¶ 13 (emphasis added)).  They also contained a provision, entitled "Liability and Indemnification," which included the following limitations on the custodian's liability:

> You [the custodian] shall not be liable to any of the undersigned for any loss suffered by the undersigned (including reasonable attorney's fees) in connection with, arising out of, or in any way related to the transactions contemplated under this Agreement, <u>unless such loss is caused by your gross negligence or willful misconduct</u>.

(<u>Id.</u> ¶ 16(B) (emphasis added)).  Although the plaintiffs acknowledge these limitations, they claim that State Street is liable for their losses because it breached its contractual obligations through negligence, gross negligence and/or willful misconduct, and because it was negligent and/or grossly negligent in carrying out its custodial obligations.

### State Street's Alleged Misconduct

At some point during the period when the plaintiffs maintained their TAG-managed custody accounts with State Street, TAG, acting without the plaintiffs' approval, began to liquidate the Szuliks' holdings in conservative, high quality stocks and bonds, and to replace those investments with suspicious, high-risk, and illiquid securities, as well as investments in real estate and personal loan instruments.  (<u>Id.</u> ¶ 17).  According to the plaintiffs, this change in strategy was not only inconsistent with the Szuliks' investment

goals, but also was illegal.  (Id.).  In particular, they claim that TAG often accepted

kickbacks and other financial benefits in exchange for making the unauthorized

investments.  (Id.).  They further contend that TAG was able to defraud them out of

millions of dollars as a result of its unscrupulous conduct.  (Id.).

The plaintiffs maintain that State Street enabled TAG to implement its unlawful

scheme by carrying out TAG's instructions and otherwise performing its custodial duties

in a manner that was incompatible with its obligations under the Custody Account

Agreements and the duties that it owed to its clients.  (See, e.g., id. ¶¶ 18-19, 23-24,

28-29, 35-39).  They also assert that they have suffered and will continue to suffer

damages as a result of State Street's alleged misconduct.  (See id. ¶¶ 55, 67, 78, 93).

### Alleged Improper Disbursement of Funds

Pursuant to the Custody Account Agreements, State Street was authorized to

disburse funds from the Szuliks' accounts in order to purchase securities and make

investments in accordance with TAG's instructions.  (See Compl. Ex. A ¶ 12; Compl. Ex.

B ¶¶ 2, 23; Def. Ex. A ¶ 1).  Thus, after TAG changed its investment strategy, it would

instruct State Street to disburse funds from the Szuliks' accounts for purposes of making

investments.  (See Compl. ¶¶ 17-19).  The plaintiffs claim that State Street carried out

those instructions in a manner which enabled TAG to use their funds for purposes that

were impermissible under the Custody Account Agreements.  (Id. ¶ 18).

As an initial matter, the plaintiffs claim that the defendant had limited authority

under the Custody Account Agreements to disburse the Szuliks' funds in exchange for the

timely receipt of securities in good form.  (<u>Id.</u> ¶ 19).  However, on numerous occasions, State Street disbursed funds to TAG in exchange for securities that lacked any value because they were not in good form as a matter of law or as a matter of accepted business usage.  (<u>Id.</u> ¶¶ 19, 22).  For example, but without limitation, State Street allegedly disbursed $200,000 from Matthew and Kyle Szulik's joint account in exchange for a purported promissory note issued by International Equine Acquisitions Holdings, Inc. ("International Equine").  (<u>Id.</u> ¶ 20).  According to the plaintiffs, the note was not in good form and was worthless because it had never been signed.  (<u>Id.</u>).

On other occasions, State Street allegedly disbursed at least $1.975 million from Matthew and Kyle Szulik's joint account in exchange for promissory notes that were purportedly issued by International Equine, but were signed by the President of TAG. (<u>Id.</u> ¶ 21).  The plaintiffs contend that those notes were not in good form and were worthless because TAG's President did not purport to execute the note on behalf of International Equine and had no authority to bind that entity in any event.  (<u>Id.</u>).

The plaintiffs contend that State Street also allowed TAG to carry out its improper investment scheme by disbursing funds from their accounts for use in transactions that were so facially irregular that State Street should have refused to carry out the disburse-ments without first taking steps to assure itself that the transactions were legitimate.  (<u>Id.</u> ¶ 38).  For instance, but again without limitation, in 2006 State Street allegedly trans-ferred at least $8.655 million from Matthew and Kyle Szulik's account to an attorney named Barry Feiner for the purported purchase of securities.  (<u>Id.</u> ¶ 39).  The Szuliks

assert that given the highly irregular nature of the arrangement, State Street should have investigated the matter before carrying out the transaction. (Id.). They maintain that if State Street had made an effort to inquire further, it would have discovered that the transactions involving Attorney Feiner were fraudulent. (Id. ¶ 40). The plaintiffs allege that State Street breached its custodial obligations, as well as a duty of care that it owed to the Szuliks, by carrying out such facially irregular transactions. (See id. ¶¶ 53, 65, 75, 90).

In addition to its alleged misconduct in executing transactions that involved defective securities or were suspicious on their face, the plaintiffs claim that State Street failed to fulfill its obligations to the Szuliks by disbursing funds from their custodial accounts without taking timely delivery of the securities. (Id. ¶¶ 23-24). For instance, State Street allegedly disbursed at least $18 million from Matthew and Kyle Szulik's account, for the purpose of purchasing stock in a company known as Conversion Services International, Inc., without taking timely possession of the stock certificates. (Id. ¶ 25). According to the plaintiffs, State Street's failure to obtain timely possession of the stock was evidenced by the fact that the certificates were not listed on the Szuliks' account statements at the time the investments were made, and by the fact that State Street continued to receive newly issued shares of Conversion Services International stock more than two years after the investments were completed. (Id.).

Allegedly, this was not the only instance in which State Street failed to take timely custody of securities that were purchased on the Szuliks' behalf. (Id. ¶ 26). According to

the plaintiffs, State Street made additional disbursements from their accounts for the purpose of purchasing stock from other companies without taking custody of those shares within an appropriate period of time.  (Id.).

Alleged Failure to Take Custody of Assets

The Custody Account Agreements expressly authorized State Street to deposit all or a portion of the Szuliks' property with a centralized securities depository system or with a sub-custodian selected by State Street.  (Compl. Ex. A ¶ 1; Compl. Ex. B ¶ 1).  A "sub-custodian" was defined to include "a branch of another U.S. bank, a foreign bank acting as custodian or a foreign securities depository" in which the defendant participated.  (Compl. Ex. B ¶ 7).  The plaintiffs claim that at various times State Street violated its custodial obligations by disbursing funds from the plaintiffs' accounts without ever taking custody of the purchased assets or depositing those assets with a suitable or qualified sub-custodian.  (See Compl. ¶¶ 28, 50, 62, 72, 87).

In particular, the plaintiffs allege that by December 2008, over $23 million worth of securities that had been purchased for Matthew and Kyle Szulik's joint custody account were not being held by State Street.  (Id. ¶ 29).  Rather, according to the plaintiffs, many of those securities were being held by TAG, entities associated with TAG, or others who were not independent of TAG.  (Id.).  Neither TAG nor its affiliates fell within the definition of a "sub-custodian" or were qualified to hold the Szuliks' assets under the parties' Agreements.  (See id. ¶¶ 28-30).  The plaintiffs contend that State Street's conduct in disbursing their funds to TAG for the purpose of purchasing

securities, without taking custody of those securities itself or depositing them with a qualified and independent sub-custodian, was improper. (See id. ¶¶ 50, 62, 72, 87).

### Allegedly Improper Reporting Activities

The Szuliks also allege that during the time when State Street served as custodian of their TAG-managed custody accounts, the defendant issued misleading reports concerning the assets held in their accounts. (See id. ¶ 31). As described above, as part of its custodial responsibilities State Street was obligated to provide periodic statements listing all securities held in the Szuliks' custody accounts, as well as the current market value of those securities, if available. (See Compl. Ex. A ¶ 10; Compl. Ex. B ¶ 15). The plaintiffs contend that State Street misrepresented the market value of various assets that it listed on their monthly account statements. (Compl. ¶ 31). In particular, the plaintiffs assert that State Street periodically listed promissory notes that had been issued by International Equine as maker of the notes at "par value." (Id. ¶ 32). However, according to the Szuliks, those notes were worthless because they were unsigned or signed only by TAG, (Id.).

On other occasions, State Street allegedly listed promissory notes on the plaintiffs' account statements that had long been in default. (Id. ¶ 33). The plaintiffs maintain that as a result of the defaults, the notes should have been heavily, if not entirely, discounted. (Id.). However, as in the case of the International Equine notes, State Street allegedly listed the defaulted notes at par value. (Id.). Thus, State Street inflated the value of assets included on the Szuliks' account statements.

The plaintiffs contend that State Street eventually acknowledged the fact that it had  improperly valued the plaintiffs' assets.  (Id. ¶ 34).  In particular, they allege that in about February 2010, State Street began to include a disclaimer on their account statements which read, "[i]nformation provided on this account statement in connection with such held at source assets was not provided or verified for accuracy by State Street. These assets are displayed for informational purposes only."  (Id.).  They further allege that in April 2011, State Street sent a letter to its custodial clients in which it acknowledged that on prior account statements it had assigned values to securities that it was no longer comfortable valuing, and that it would not assign a value to those securities on future account statements.  (Id.).  Nevertheless, the plaintiffs claim that State Street's prior conduct in misreporting the value of the assets on their account statements constituted a breach its custodial obligations.  (See id. ¶¶ 51, 63, 73, 88).

According to the plaintiffs, State Street's misrepresentations regarding the market value of their assets enabled the defendant to charge excessive custodial fees.  (See id. 41-44).  Specifically, they claim that the fee which State Street charged for its services was based on a percentage of the value of the assets held by State Street in the Szuliks' custody accounts.  (Id. ¶¶ 14, 41).  Thus, by providing inflated valuations for the assets held in those accounts, State Street was able to obtain excessive custodial fees from the plaintiffs.  (See id. ¶¶ 42, 44).

As an example of the defendant's improper fee calculations, the plaintiffs allege that on one occasion in October 2007, the defendant issued an account statement indi-

cating that it had charged a custodial fee that had been calculated based on approximately $80 million worth of assets.  (Id. ¶ 43).  However, the statement allegedly included about $2.8 million worth of promissory notes that had matured long before the date of the statement, and were therefore in default.  (Id.).  The plaintiffs contend that the promissory notes were worthless, and should not have been considered by State Street in connection with the calculation of its custodial fee.  (Id.).  Similarly, they claim that State Street should not have calculated fees based on other assets that were overvalued because they were in default or not in good form.  (See id. ¶ 44).

Alleged Use of Fake CUSIP Numbers

The plaintiffs contend that their account statements also were misleading because State Street assigned phony CUSIP numbers to securities listed in the statements.  (Id. ¶¶ 35-37).  A CUSIP number is a unique, 9-character alphanumeric identifier that Standard & Poor's assigns to North American securities in order to facilitate the clearing and settlement of securities trades.  (Id. ¶ 35).  Allegedly, State Street included CUSIP numbers for all of the securities that it listed on the Szuliks' monthly account statements. (Id. ¶ 36).  However, contrary to State Street's representations, Standard & Poor's had never assigned CUSIP numbers to many of those securities.  (Id. ¶¶ 36-37).  Therefore, according to the plaintiffs, many of the numbers that State Street listed as CUSIPs on their account statements were fake.  (See id. ¶ 37).

The plaintiffs maintain that a CUSIP number is the hallmark of a legitimate domestic security.  (Id. ¶ 35).  Accordingly, they claim that State Street's use of phony

CUSIP numbers misled them into believing that the assets in their custody accounts

consisted of legitimate securities when, in fact, those assets consisted of highly specula-

tive and illiquid securities and worthless promissory notes.  (See id. ¶¶ 17, 32-33, 36-37).

According to the plaintiffs, State Street's misconduct in carrying out its custodial

activities, combined with its lack of oversight, enabled TAG to engage in unauthorized

and illegal investment activity using the Szuliks' funds.  (Compl. at 1).  By their claims in

this action, the plaintiffs are seeking an award of damages against State Street, as well as

disgorgement of all fees paid to the defendant in connection with its maintenance of their

custody accounts.  (See id. at 16 (Prayers for Relief)).

Additional factual details relevant to this court's analysis are described below

where appropriate.

## III.  ANALYSIS

### A.    Standard of Review

State Street has moved to dismiss the Szuliks' claims pursuant to Fed. R. Civ. P.

8(a) and 12(b)(6).  Rule 8(a) provides in relevant part that "[a] pleading that states a claim

for relief must contain . . . a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8

announces does not require 'detailed factual allegations,' but it demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556

U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)).

Accordingly, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966).

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. Cooperman, 171 F.3d at 46. Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559, 127 S. Ct. at 1967).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.'" Id. (quoting Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949) (internal citations omitted). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.'" Id. (quoting Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950). "This second principle recognizes that the court's assessment of the pleadings is 'context-specific,' requiring 'the reviewing

court to draw on its judicial experience and common sense.' '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief.'" Id. (quoting Twombly, 556 U.S. at 679, 129 S. Ct. at 1950) (internal quotations and citation omitted; alterations in original).

### B.     Sufficiency of Plaintiffs' Allegations Under Rule 8(a)

The defendant argues, as an initial matter, that the complaint should be dismissed for failure to comply with Fed. R. Civ. P. 8(a).  Specifically, State Street asserts that the plaintiffs' allegations are inadequate because they offer few specifics regarding the alleged misconduct, and lump together all accounts and the separate Custody Account Agreements governing them.  It also argues that because the plaintiffs have failed to identify any challenged transaction in any custody account other than the account estab-lished under the Joint Account Agreement between the defendant and Matthew and Kyle Szulik, it "falls entirely to State Street to devine, over a 12 year period, the remaining challenged transactions, if any."  (Def. Mem. (Docket No. 15) at 7).  However, this court finds that the plaintiffs' allegations are sufficient to meet the liberal notice pleading requirements of Rule 8(a).

"The purpose of the notice pleading requirements set forth in Fed. R. Civ. P. 8(a) is to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  Phelps v. Local 0222, No. 09-11218-JLT, 2010 WL 3342031, at *5 (D. Mass. Aug. 20, 2010) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S.

Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (quotations and citations omitted)).  In addition, the

pleadings "must afford the defendants a meaningful opportunity to mount a defense."

Benyamin v. Commonwealth Med. UMass Med. Ctr., Inc., No. 11-40126-FDS, 2011 WL

2681195, at *2 (D. Mass. July 6, 2011) (quoting Diaz-Rivera v. Rivera-Rodriguez, 377

F.3d 119, 123 (1st Cir. 2004) (internal punctuation and additional citations omitted)).

Thus, at a minimum, "the complaint should at least set forth minimal facts as to who did

what to whom, when, where, and why."  Id. (quoting Educadores Puertorriquenos en

Accion v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004)).  "While a court may dismiss a

pleading that does not comply with the notice pleading requirements of Rule 8, the exer-

cise of this power is generally reserved for a pleading that is 'so confused, ambiguous,

vague, or otherwise unintelligible that its true substance, if  any, is well disguised.'"

Black v. UNUMProvident Corp., 245 F. Supp. 2d 194, 197 (D. Me. 2003) (quoting

Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995) (internal quotations and citations

omitted)).  The complaint at issue in this case is not one of those pleadings.

Although the plaintiffs have not described every transaction in which State Street

allegedly violated the terms of the Custody Account Agreements or otherwise engaged in

misconduct, they have alleged a pattern and practice of behavior involving all of the

Szuliks' TAG-managed custody accounts during the time period from 1996 to 2009.

Moreover, they have described the basis for their claim that State Street owed them cer-

tain duties and obligations, and have alleged facts detailing the specific types of activities

that resulted in the alleged breaches of those duties or otherwise gave rise to their claims.

In particular, the plaintiffs have provided specific examples of State Street's allegedly unlawful conduct in order to illustrate how the defendant failed to honor its alleged obligations as the Szuliks' custodian, and they have even suggested a motive for State Street's alleged misconduct: the defendant's interest in collecting custodial fees based on inflated asset values.  Therefore, the plaintiffs have alleged enough facts to establish who did what to whom, when, where, and why.  As evidenced by the extensive arguments presented by State Street in its motion to dismiss, this is more than sufficient to notify State Street as to the nature of the plaintiffs' claims and grounds upon which those claims rest, and to enable State Street to mount a defense.  No more is needed in order to meet the liberal notice pleading standard set forth in Fed. R. Civ. P. 8(a).

**C.    Counts I and II: Claims for Breach of Contract**

In Counts I and II of their complaint, the Szuliks have asserted claims for breach of contract.  Specifically, in Count I, the Szuliks claim that State Street breached the terms of the Joint Account Agreement by negligently and/or willfully (1) disbursing Matthew and Kyle Szulik's funds in exchange for securities that were not in good form as a matter of law or accepted business usage; (2) disbursing the plaintiffs' funds for the purpose of purchasing stock that was not delivered on a timely basis; (3) disbursing the plaintiffs' funds in connection with facially irregular transactions; (4) disbursing the plaintiffs' funds without taking custody of the purchased securities or entrusting the securities to a qualified and independent custodian; (5) improperly reporting the value of the Szuliks' assets; (6) listing fake CUSIP numbers on the plaintiffs' account statements; and (7)

charging excessive custodial fees based on inflated asset values.  (Compl. ¶¶ 48-54).  In

Count II, the Szuliks claim that State Street breached the terms of the Raymond Trust

Agreement and the Szulik Children Trust Agreements, through gross negligence and/or

willful misconduct, by engaging in the same conduct alleged in support of Count I.  (See

id. ¶¶ 60-66).  State Street contends that Counts I and II must be dismissed because the

Agreements do not impose the duties and obligations upon the custodian that State Street

allegedly breached, and because any losses that the Szuliks sustained were caused by

TAG's or the plaintiffs' own investment decisions rather than State Street's alleged

misconduct.  (Def. Mem. at 8).  This court recommends that the motion to dismiss Counts

I and II be allowed in part and denied in part as detailed below.

### i.      General Principles of Contract Interpretation

The parties' dispute requires this court to interpret the provisions of the Custody

Account Agreements.  It is undisputed that the Joint Account Agreement is governed by

New York law, and that the Raymond Trust Agreement and the Szulik Children Trust

Agreements are governed by Massachusetts law.  (See Def. Mem. at 8 n.10; Pl. Opp.

Mem. (Docket No. 18) at 5 n.6).  However, the governing principles of contract

interpretation are the same in both jurisdictions.  Thus,

> [a] court interpreting a contract must first assess whether the contract
> is ambiguous.  *See Bank v. Thermo Elemental Inc.*, 451 Mass. 638,
> 888 N.E.2d 897, 907 (2008).  "To answer the ambiguity question,
> the court must first examine the language of the contract by itself,
> independent of extrinsic evidence concerning the drafting history or
> the intention of the parties."  *Id.*   "Ambiguity is not created merely
> because the litigants disagree about the meaning of a contract."

> *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004). Rather, "a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d at 424 (internal quotation marks and citation omitted).
>
> The meaning of an unambiguous contract term is a question of law, while the meaning of an ambiguous contract term is a question of fact. *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 761 N.E.2d 946, 951 (2002); *see also Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992). "Should the court find the contract language unambiguous, [it must] interpret it according to its plain terms." *Den Norske Bank AS*, 75 F.3d at 52.

Farmers Ins. Exchange v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011); accord

Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 195 (E.D.N.Y. 2007).

Additionally, when interpreting a contract under Massachusetts or New York law, the contract should be read as a whole, and should be interpreted so as to give effect to the objective intent of the parties. See Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005); Polito v. Sch. Comm. of Peabody, 69 Mass. App. Ct. 393, 396, 868 N.E.2d 624, 626-27 (2007). "'Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'" Cadle Co. v. Vargas, 55 Mass. App. Ct. 361, 366, 771 N.E.2d 179, 183 (2002) (quoting Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001)); see also Postlewaite, 411 F.3d at 69 (rejecting proposed interpretation of contract that ignores common sense, as well as objective, reasonable expectations of parties to such contracts).

-22-

### ii.    Claims Regarding Disbursement of Funds

As described above, the Szuliks claim, inter alia, that State Street breached its obligations under the Custody Account Agreements by disbursing the plaintiffs' funds in exchange for securities that were not in good form and were not timely received, disbursing the plaintiffs' funds in connection with facially irregular transactions, and disbursing the plaintiffs' funds without taking proper custody of the purchased assets.  State Street has moved to dismiss these claims on the grounds that the Agreements granted the custodian unrestricted authority to make disbursements in accordance with TAG's instructions, imposed no obligations on State Street to receive securities at a particular time or in a particular form, and did not require the custodian to take custody of all the assets listed on the plaintiffs' custody account statements.  (Def. Mem. at 8-11).  For the reasons that follow, this court finds that the plain language of the Agreements absolved State Street from any duty to insure the timely receipt of securities, to take custody of assets that were not delivered to it, or to question the legitimacy of transactions before making disbursements in accordance with TAG's instructions.  However, this court concludes that the plaintiffs have stated a claim for breach of contract based on State Street's alleged disbursement of funds in exchange for securities that were not in good form as a matter of law or accepted business usage.

**Alleged Untimely Delivery of Stock**

The plaintiffs allege that under each of the Custody Account Agreements, State Street was authorized to disburse funds "in exchange for the timely receipt of securities in good form." (Compl. ¶ 15).  They further claim that the defendant breached those Agreements by disbursing funds from their custodial accounts, for the purpose of purchasing stock, without taking timely delivery of the stock certificates.  (Id. ¶¶ 23-26, 49, 61).  For the reasons that follow, this court finds that the unambiguous terms of the Custody Account Agreements undermine the plaintiffs' timeliness claims.

Defendant's Obligations Under the Joint Account Agreement

Pursuant to the Joint Account Agreement between Matthew and Kyle Szulik and the defendant, the plaintiffs authorized State Street to act upon TAG's instructions "to purchase or receive securities and make payment therefor as set forth in such instructions." (Compl. Ex. A ¶ 12(A)).  However, there was no requirement that State Street receive securities within a particular time following its disbursement of funds to TAG or following TAG's purchase of securities for the plaintiffs' account.  Rather, under paragraph 11 of the Agreement, which is entitled "Instructions," State Street was directed as follows:

> You are to follow and rely upon any instructions given pursuant to the terms of this Agreement which you believe to be genuine.  Such instructions may, in your discretion, be written, oral, by telephone, by telecopy or electronic communication.  Written confirmation, if any, of oral instructions shall in no way affect any action taken by you in reliance upon the oral instructions.  When executing all instructions, you will effect all payment or delivery or take other

> relevant actions called for by the instructions in accordance with generally accepted industry practices.
>
> You shall maintain regular business records documenting all instructions transmitted through any means previously described and any response by you.  Such records shall be determinative of the form, content and time of all instructions and any response.  <u>With respect to any directions to receive securities, you shall have no duty or responsibility to advise the undersigned of non-receipt of, or to take any steps to obtain delivery of, securities from brokers or others either against payment or free of payment</u>.

(<u>Id.</u> ¶ 11 (emphasis added)).  Thus, under the express terms of the Joint Account Agreement, State Street was relieved of any duty to obtain delivery, much less timely delivery, of securities for which it disbursed payment in accordance with instructions from TAG.  As alleged in the complaint, all of the disbursements at issue were made pursuant to TAG's instructions.  (<u>See</u> Compl. ¶¶ 18, 23).  Therefore, the plaintiffs' timeliness allegations are at odds with the plain language of the Joint Account Agreement.

It is undisputed that in June 1997, Matthew and Kyle Szulik entered into a Custody Account Funds Transfer Agreement ("Funds Transfer Agreement"), which supplemented and amended the Joint Account Agreement between the plaintiffs and State Street.  (<u>See</u> Def. Mem. at 3 n.4; Pl. Opp. Mem. at 8; Def. Ex. A at preamble).  Pursuant to the Funds Transfer Agreement, the Szuliks authorized the defendant "to execute funds transfer or withdrawal instructions ('Payment Orders')" as instructed by Matthew and Kyle Szulik or by TAG.  (Def. Ex. A at preamble).  Again, however, there was no requirement that State Street receive any securities that may have been purchased with the plaintiffs' funds, or that the delivery of any such securities occur within a particular time

following the transfer or withdrawal of the plaintiffs' funds.  (See generally Def. Ex. A).

Accordingly, nothing in Funds Transfer Agreement was inconsistent with or otherwise

altered the Instructions provision of the Joint Account Agreement pertaining to non-

receipt of securities.  Therefore, State Street did not breach the Joint Account Agreement

by disbursing funds from the Joint Account without taking timely delivery of stock

certificates.

Defendant's Obligations Under the Raymond
and Szulik Children Trust Agreements

The plain language of the Raymond Trust Agreement and the Szulik Children

Trust Agreements also precludes the Szuliks' claims for breach of contract based on the

untimely receipt of securities.  Under those Agreements, the defendant was authorized to

act upon TAG's instructions "to purchase or receive securities and make payment

therefore as set forth in such instructions."  (Compl. Ex. B ¶ 23.a)(A)).  However, they

contained no requirement that State Street take possession of such securities or that it do

so within a particular time following its disbursement of funds from the plaintiffs'

custody accounts or the purchase of securities by TAG.  Moreover, as in the case of the

Joint Account Agreement, the plain language of the Raymond and Szulik Children Trust

Agreements undermines the plaintiffs' efforts to hold State Street liable for its alleged

failure to take timely custody of securities that were purchased with funds from the

Szuliks' accounts.  Specifically, the Agreements expressly provided that "you [custodian]

shall have no duty or responsibility . . . for any act or omission . . . of any agent selected

by you . . . or by the undersigned or any other person to effect any transaction for the Account" or "for any loss occasioned by delay in the actual receipt of notice by you or any payment, redemption or other transaction in respect to which you are authorized to take some action pursuant to this Agreement."  (Compl. Ex. B ¶ 16(A)(c) and (e)).  Thus, State Street cannot be held liable for any losses that the plaintiffs may have sustained due to a delay in its receipt of securities that were purchased with funds from the plaintiffs' custody accounts.

### Alleged Failure to Take Custody of Purchased Securities

The plaintiffs' claims that State Street breached the Custody Account Agreements by failing to take custody of the Szuliks' assets or depositing them with an appropriate sub-custodian are similarly unsupported by the plain language of the Agreements.  As described above, the Joint Account Agreement specifically absolved the custodian of any obligation to "take any steps to obtain delivery of, securities from brokers or others either against payment or free of payment."  (Compl. Ex. A ¶ 11).  Moreover, none of the other Agreements imposed an obligation upon State Street to obtain possession of assets that were never delivered to the custodian.  Instead, all of the Agreements contemplated that the defendant would be responsible only for those securities that it actually received for the plaintiffs.

Under each of the Custody Account Agreements, State Street was authorized to establish custody accounts "for the purpose of holding or disposing of any property *received* by [the custodian] for the [Szuliks.]"  (Compl. Ex. A at preamble (emphasis

-27-

added); see also Compl. Ex. B at preamble).  Additionally, the Joint Account Agreement provided that "[y]ou [the custodian] may provide safekeeping of the property *under your control* according to your operational procedures[,]" and the Raymond and Szulik Children Trust Agreements provided that "[y]ou [the custodian] shall have no liability for any statement memo entries regarding assets not held or controlled by you."  (Compl. Ex. A ¶ 1; Compl. Ex. B ¶16(B)).  Thus, under the plain language of the Agreements, State Street's obligation to hold and safeguard the plaintiffs' investments extended only to those investments that State Street actually received and over which it could exercise control.  State Street could not have breached its contractual obligations by failing to take custody of assets that remained in the possession of TAG or an affiliate of TAG and were never delivered to the custodian.

The plaintiffs' assertion that "State Street was contractually obligated to disburse cash or securities 'against receipt' of corresponding securities or cash" is not supported by the relevant terms of the Custody Account Agreements.  (See Pl. Opp. Mem. at 7).  The Szuliks' argument is based on a provision in the Agreements which authorized the custodian to act upon TAG's instructions "[t]o sell, deliver or exchange any securities or other property against receipt by you [the custodian] of such payment set forth in such instructions and to purchase or receive securities and make payments therefor as set forth in such instructions."  (See id.; Compl. Ex. A ¶ 12(A); Compl. Ex. B ¶ 23.a)).  By its plain terms, this language authorized the custodian to sell, deliver or exchange property "against receipt" of "payment" and to purchase or receive and pay for securities in

accordance with TAG's instructions.  It did not require the defendant to make purchases

against receipt of securities or otherwise take custody of purchased securities unless

instructed to do so by TAG.

Similarly, despite the plaintiffs' arguments to the contrary, neither the preamble to

the Agreements nor the provisions regarding the custodian's use of depositories required

the defendant to take custody of assets that it never received from TAG or were not

otherwise delivered to it.  (See Pl. Opp. Mem. at 10-11).  As described above, the

preamble to each of the Custody Account Agreements authorized State Street and its

predecessors to establish custody accounts "for the purpose of holding or disposing of

any property *received* by [the custodian]" for the Szuliks.  (Compl. Ex. A at preamble

(emphasis added); see also Compl. Ex. B at preamble).  Thus, the preamble manifests an

intent to make State Street responsible for property that it received, but not for property

that was retained by TAG or others and was never in State Street's possession.

With respect to the provisions concerning the use of depositories, the Joint

Account Agreement provided that "[y]ou [the custodian] may provide safekeeping of the

property *under your control* according to your operational procedures[,]" and it

authorized the custodian to deposit all or any part of such property with a centralized

securities depository system ("SDS") or sub-custodian of the defendant's choosing.

(Compl. Ex A ¶ 1 (emphasis added)).  It also required that "[a]ll stocks and other

securities in registered form held in the Account are to be registered in the name of your

nominee or a nominee of the relevant SDS or subcustodian."  (Id.).  However, it did not

require State Street to obtain custody of assets that remained in the possession of others or were not under its control.

Similarly, the "Use of Depositories" provisions of the Raymond Trust Agreement and the Szulik Children Trust Agreements authorized State Street to "provide safekeeping of the Property" that it received for the plaintiffs "according to your operational procedures[,]" and to deposit all or any part of such Property with an SDS or sub-custodian selected by the defendant.  (Compl. Ex. B ¶ 1).  They also required that "stocks and other securities in registered form held in the Account are to be registered in the name of your nominee or a nominee of the relevant SDS or sub-custodian."  (Id.). However, the provisions relating to the use of depositories did not require State Street to obtain custody of assets that had not been delivered to it, or to provide safekeeping of securities that were not in its possession or control.

Finally, the plaintiffs' argument that State Street's status as a custodian rendered it the "guardian" of the Szuliks' property does not alter this court's determination that State Street had no contractual obligation to provide safekeeping of assets that it never received.  As the plaintiffs point out, a "custodian" is defined as "one that guards and protects or maintains; *especially*: one entrusted with guarding and keeping property or records[.]"  Merriam-Webster's Online Dictionary, http://www.merriamwebster.com/dictionary/custodian.  However, there is no inconsistency between a custodian's role in guarding and maintaining property and State Street's contractual duty to hold and safeguard only those assets that it received for the

Szuliks.  Indeed, the plaintiffs' suggestion that State Street was somehow responsible for taking custody of property that was never delivered to it defies common sense as well as the relevant language of the Custody Account Agreements.  Accordingly, the plaintiffs have failed to state a breach of contract claim based on State Street's alleged failure to take custody of all of the assets listed on the account statements or to deposit such assets with a qualified sub-custodian.

### Alleged Receipt of Securities That Were Not in Good Form

State Street also has moved to dismiss the plaintiffs' claims that the defendant breached the Custody Account Agreements by disbursing funds in exchange for securities that were not in good form or accepted business usage because they were unsigned or signed only by TAG.  The defendant argues that such claims rest on the false allegation that the Custody Account Agreements only allowed State Street to disburse funds in exchange for securities that were in good form, when in fact the Agreements say no such thing and instead granted State Street unqualified authority to make disbursements and receive securities at TAG's direction.  (Def. Mem. at 9-11).  Although the Agreements lacked any affirmative requirement that State Street accept only securities that were in good form, this court finds that at this stage in the litigation, the plaintiffs have stated claims for breach of contract based on allegations that State Street continued to disburse the plaintiffs' funds in exchange for obviously defective securities.

As asserted by State Street in support of its motion to dismiss, the Custody Account Agreements authorized the defendant to carry out TAG's instructions, without

further approval from the Szuliks, "to purchase or receive securities and make payment

therefor as set forth in such instructions." (Compl. Ex. A ¶ 12(A); Compl. Ex. B

¶ 23.a)(A)). The Agreements contained no specific language that required State Street to

accept securities only if they were in a particular form, and they expressly provided that

State Street and its predecessors had no responsibility to supervise, recommend or advise

the plaintiffs with respect to any investment decisions, including decisions relating to the

purchase, sale or retention of property. (See Compl. Ex. A ¶13; Compl. Ex. B

¶ 16(A)(a)). On the other hand, nothing in the Agreements authorized the defendant to

accept unsigned and otherwise defective promissory notes that amounted to worthless

pieces of paper rather than legitimate securities or other forms of property. (See Compl.

¶¶ 19-22). Because the parties agreed that the defendant would be responsible for

holding and disposing of "property," and for purchasing and receiving "securities" in

accordance with TAG's instructions (see Compl. Ex. A at preamble and ¶ 12(A); Compl.

Ex. B at preamble and ¶ 23.a)(A)), it is unclear whether State Street exceeded its

authority or otherwise breached its contractual obligations by accepting obviously

defective and valueless securities in lieu of legitimate assets.

Indeed, under the Raymond Trust Agreement and the Szulik Children Trust

Agreements, State Street was granted specific authority to reject securities that were not

in good form. As the Agreements provided, "[y]ou [the custodian] reserve the right to

refuse to accept any investment for the Account, which is in a form, or condition which

you, in your sole discretion, determine is not compatible with the services to be

performed under this Agreement." (Compl. Ex. B ¶ 3). The plaintiffs' allegations that State Street repeatedly disbursed funds in exchange for securities that were not in good form and were defective on their face, notwithstanding its authority to reject such investments, raises a question of fact as to whether the defendant's conduct frustrated the reasonable expectations of the contracting parties.

<u>**Facially Irregular Transactions**</u>

To the extent the plaintiffs' breach of contract claims arise out of the defendant's alleged conduct in disbursing funds for use in facially irregular transactions, such as the transfer of funds to an attorney for the purported purchase of securities, this court finds that those claims cannot survive the motion to dismiss. In support of those claims the plaintiffs allege that the transactions "were so facially irregular that State Street should not have disbursed any funds without first taking further steps to assure itself that the transaction was legitimate." (Compl. ¶ 38; <u>see</u> <u>also</u> Compl. ¶ 39). However, the plaintiffs' assertion that State Street was obligated to question or investigate such transactions before disbursing the plaintiffs' funds is belied by the express language of the Custody Account Agreements.

Pursuant to each of the Agreements, the plaintiffs authorized TAG, not State Street, to make all investment decisions for their accounts. Thus, State Street was directed to carry out TAG's instructions to purchase and pay for securities, but was instructed not to "supervise, recommend or advise the [Szuliks] relative to the investment, purchase, sale, retention or other disposition of any property" held on their behalf. (<u>See</u>

Compl. Ex. A ¶¶ 11-13; see also Compl. Ex. B ¶¶ 13, 16(A)(a), 23.a)(A)).  Moreover, the

plaintiffs expressly authorized State Street to "execute funds transfer or withdrawal

instructions ('Payment Orders')" in accordance with TAG's instructions, and to do so

"*without inquiry into the circumstances*[.]"  (Def. Ex. A at preamble and ¶ 1; Compl. Ex.

B ¶ 5 (emphasis added)).  Accordingly, State Street's alleged failure to inquire into the

circumstances of an investment decision before disbursing funds in accordance with

TAG's instructions cannot form the basis for a breach of contract claim.

The plaintiffs nevertheless argue that the defendant had no authority to make such

disbursements under the terms of the Joint Account Agreement.  Specifically, they con-

tend that under the provisions of the Agreement entitled "Limited Trading Authority," the

Szuliks expressly withheld permission for State Street to "issue checks drawn against the

Account, payable to any payee" as directed by TAG.  (Pl. Opp. Mem. at 8 (quoting

Compl. Ex. A ¶ 12(A)).  Therefore, according to the plaintiffs, the Joint Account Agree-

ment "cannot be read to bestow unfettered authority to make *any* disbursement."  (Id.).

The plaintiffs' interpretation of the Joint Account Agreement is not supported by

the record.  As the plaintiffs acknowledge, that Agreement was supplemented and

amended by the terms of a Funds Transfer Agreement.  (See id. at 8; Def. Ex. A at

preamble).  Pursuant to the Funds Transfer Agreement, Matthew and Kyle Szulik

explicitly authorized State Street "to execute funds transfer or withdrawal instructions

('Payment Orders') as instructed by the undersigned or the undersigned's agent(s)."

(Def. Ex. A at preamble).  Additionally, under the Funds Transfer Agreement, the

defendant was

> <u>authorized to honor and execute Payment Orders, including Payment
> Orders that may create an overdraft and those that are for the benefit
> of any authorized representative, officer, agent or employee of the
> undersigned, without inquiry into the circumstances</u>; the [custodian]
> has the right to refuse Funds Transfer instructions if sufficient funds
> are not available in the account.  Except as otherwise modified
> hereby or by the Custody Account Agreement(s), the parties intend
> that the transactions contemplated hereby are deemed funds transfers
> subject to the Uniform Commercial Code.

(<u>Id.</u> ¶ 1 (emphasis added)).  Thus, although the defendant did not have unfettered

authority to make <u>any</u> disbursements, it did have authority to disburse funds in

accordance with TAG's instructions, and to do so without any obligation to question the

circumstances.

Equally unpersuasive is the plaintiffs' argument that the Funds Transfer Agree-

ment did nothing more than update the Joint Account Agreement "to clarify that wire

transfers would be conducted according to the Uniform Commercial Code."  (Pl. Opp.

Mem. at 8).  Although the parties agreed that any Payment Orders executed pursuant to

the Funds Transfer Agreement would be deemed subject to the Uniform Commercial

Code, they also agreed that State Street would have authority to execute Payment Orders

in accordance with TAG's instructions and without inquiry into the circumstances of such

Payment Orders.  (<u>See</u> Def. Ex. A ¶ 1).

Finally, the plaintiffs' argument that the Funds Transfer Agreement "expressly

limited fund transfers to those '*for the benefit* of any authorized representative, officer,

agent, or employee'" of the Szuliks is at odds with the Agreement's plain language.  (See Pl. Opp. Mem. at 8).  As quoted above, the Agreement authorized the defendant to execute Payment Orders, "*including* Payment Orders . . . that are for the benefit of any authorized representative, officer, agent or employee" of the Szuliks.  (Def. Ex. A ¶ 1).  It did not restrict the defendant's authority to execute Payment Orders that were not for the benefit of such individuals, as long as State Street was acting in accordance with the Szuliks' or TAG's instructions.  Accordingly, the plaintiffs' claim that State Street breached the terms of the Custody Account Agreements by disbursing funds in connection with facially irregular transactions should be dismissed.

### iii.    Claims Regarding Account Statements

In Count I of their complaint, the Szuliks claim that State Street breached the Joint Account Agreement by negligently and/or willfully misreporting the value of the Szuliks' assets and listing phony CUSIP numbers on the plaintiffs' account statements.  (Compl. ¶¶ 51-52).  Similarly, in Count II of their complaint, the Szuliks claim that State Street engaged in gross negligence and/or willful misconduct, in breach of the Raymond Trust Agreement and the Szulik Children Trust Agreements, when it misreported the value of the plaintiffs' assets and included fake CUSIP numbers on the account statements.  (Id. ¶¶ 63-64).  For the reasons set forth below, this court finds that the plaintiffs have waived these claims to the extent they arise under the two latter Agreements, but that they should have an opportunity to pursue such claims to the extent they arise under the Joint Account Agreement.

## Waiver

The Raymond Trust Agreement and the Szulik Children Trust Agreements contain a provision entitled "Statement of Account," which describes State Street's obligation to issue account statements as follows:

> A statement of all transactions in the Account, with a list of the securities held in the Account, including current market value, if available to you [the custodian], shall be rendered no less frequently than quarterly.  <u>In the absence of the filing in writing with you [the custodian] by the undersigned of  exceptions or objections to any such statement within sixty (60) days of issuance date, the undersigned shall be deemed to have approved such statement, and you [the custodian] shall be released, relieved and discharged with respect to all items set forth therein</u>.  Market values are obtained from sources that you believe to be reliable, however, you cannot guarantee their accuracy.

(Compl. Ex. B ¶ 15 (emphasis added)).  State Street argues that this provision forecloses the plaintiffs' ability to challenge the account statements as part of this litigation.  (Def. Reply Mem. (Docket No. 20) at 6).  This court agrees.  The plaintiffs do not allege, nor do they argue, that they raised any objection or even questioned the account statements within the 60 day period.  Therefore, under the unambiguous language of the Statement of Account provisions, they have waived any right to challenge such statements in this case under a breach of contract theory.

The plaintiffs contend that no waiver has occurred because the provisions address only "a situation where an investment adviser executes  an unauthorized trade and the client knows about the trade from the face of her account statement.  After a certain

period of time without her objection, she [the client] will have ratified the unauthorized

trade." (Pl. Opp. Mem. at 16). This argument ignores the plain language of the Agree-

ments, which say nothing about the investment advisor or any unauthorized trading.

Rather, the relevant provisions establish a general requirement that any "exceptions or

objections" be set forth in writing within 60 days of issuance of an account statement or

else the account statement will be deemed to have been approved by the plaintiffs.

The plaintiffs' argument that no waiver took place because it would not have been

apparent from the face of the account statements that something objectionable had

occurred, while appealing, also is insufficient to withstand State Street's motion to dis-

miss. (See id. at 16-17). In P.R. Tel. Co., Inc. v. SprintCom, Inc., 662 F.3d 74 (1st Cir.

2011), the First Circuit rejected a similar argument involving similar waiver language.

The contract at issue in that case contained a Waiver Provision, which provided in

relevant part that "[i]f objection in writing is not received by the billing party within (30)

days after a bill is mailed, the account shall be deemed correct and binding upon the

billed entity." P.R. Tel. Co., 662 F.3d at 95. Notwithstanding the language of the

contract, the defendant in P.R. Tel. Co. argued that it could not have waived its rights to

challenge the plaintiff's invoices because the invoices did not contain enough information

to enable the defendant to detect any errors in the billing. Id. at 97. The First Circuit

rejected the defendant's assertion, finding that its argument "has no basis in the

Agreement, which included no such exception to the operation of the Waiver Provision."

Id. The court also found that there was "no evidence suggesting that the parties common-

ly intended to include such an exception in the Waiver Provision." Id. Accordingly, the court "decline[d] to read such an exception into the Waiver Provision" and conclude[d] that the defendant's argument was "without merit." Id.[5]

Similarly, in this case, the Custody Account Agreements at issue contain no language limiting the Szuliks' waiver of their right to challenge the account statements to situations where State Street disclosed enough information for the plaintiffs to detect any errors in those statements. Furthermore, there are no allegations suggesting that the parties intended to include any such limitation in the Statement of Account provisions. Therefore, the plaintiffs' argument that they could not have known about the alleged problems with the account statements is insufficient to support their claims under the Raymond Trust and Szulik Children Trust Agreements.[6]

---

[5] Massachusetts state courts have found waiver provisions such as the one at issue in this case to be unenforceable where the plaintiff's failure to object within the requisite time period was the direct result of the defendant's fraudulent concealment. See Patsos v. First Albany Corp., 433 Mass. 323, 338, 741 N.E.2d 841, 853 (2001). This is because, under Massachusetts law, "[t]he defendant's alleged fraudulent concealment cannot be asserted to defeat what may be legitimate claims for substantial damages." Patsos v. First Albany Corp., 48 Mass. App. Ct. 266, 273, 719 N.E.2d 882, 887 (1999), aff'd 433 Mass. 323, 741 N.E.2d 841 (2001). In the instant case, the plaintiffs have not alleged that State Street's failure to disclose information that would have alerted them to inaccuracies in the account statements was the result of any fraudulent conduct. Accordingly, the courts' holdings in the Patsos cases do not render the waiver provisions of the Custody Account Agreements unenforceable.

[6] The plaintiffs' reliance on Comm'r of Banks v. Chase Sec. Corp., 298 Mass. 285, 10 N.E.2d 472 (1937), does not support their assertion that no waiver occurred. That case did not involve a contractual agreement containing a waiver provision such as the one at issue here. Rather, the relevant issue before the court in that case was whether, under common law, a purchaser of securities had ratified the purchase so that the purchaser was precluded from challenging the legality of the transaction and seeking rescission of the transaction. See Comm'r of Banks, 298 Mass. at 322-23, 10 N.E.2d at 495-96. The court found that under Massachusetts

Because the Szuliks have waived their claims that State Street breached the Raymond Trust Agreement and the Szulik Children Trust Agreements by misreporting the value of the plaintiffs' assets and listing fake CUSIP numbers on the plaintiffs' account statements, this court recommends that those claims be dismissed. However, for the reasons that follow, this court recommends that the plaintiffs have an opportunity to pursue their claims that State Street breached the Joint Account Agreement by negligently and/or willfully misreporting the value of assets and listing phony CUSIP numbers on Matthew and Kyle Szulik's account statements.

## Valuation of Assets

State Street argues that the plaintiffs have failed to state a breach of contract claim under the Joint Account Agreement based on the alleged inaccurate valuation of assets because the custodian had no independent obligation to value the assets and no duty to verify the accuracy of any reported asset values. (Pl. Mem. at 13-14). The Statement of Account provision contained in the Joint Account Agreement provided that "[a] statement of all transactions in the Account, with a list of the securities held in the Account, including current market value, if available to you [the custodian], shall be rendered

---

law, such ratification could not occur unless the plaintiffs chose to hold the stock after acquiring knowledge of material facts showing that the transaction had violated state law. Id. Because there was no evidence that the plaintiffs had knowledge of any such facts, the court concluded that there was no evidence to warrant a finding of ratification. Id. at 323-26, 10 N.E.2d at 496-97. There is nothing in that case to suggest that the same principle should be applied to situations involving an express agreement by the plaintiff that any exceptions or objections would be foreclosed if not raised within a particular time. As described above, the First Circuit has held that such agreements should be enforced in accordance with their plain language.

monthly."  (Compl. Ex. A ¶ 10).  Although the plaintiffs do not dispute that the provision imposes no affirmative obligation upon the defendant to value or verify the value of securities contained in the custody account (see Pl. Opp. Mem. at 12), this court finds that the plaintiffs have alleged sufficient facts to support a claim that State Street's conduct in misreporting the value of the Szuliks' assets constituted a breach of the Joint Account Agreement.

As described above, the plaintiffs allege that the defendant listed promissory notes at par value on the account statements even though the notes were worthless because they were unsigned or signed only by TAG rather than the maker of the notes.  (Compl. ¶ 32). They also claim that State Street listed promissory notes at par value even though the notes had long been in default and should have been heavily, if not entirely, discounted. (Id. ¶ 33).  Moreover, the plaintiffs allege that in April 2011, the defendant  notified them that "prior account statements had assigned value to securities that State Street was no longer comfortable valuing, and that, as a result, future account statements would no longer assign value to those securities."  (Id. ¶ 34).  These allegations support an infer- ence that State Street knew or should have known that market values contained in the account statements were inflated and would mislead the plaintiffs about the true value of assets contained in their portfolio.[7]  Even if State Street had no specific obligation to

---

[7] State Street points out that the Szuliks filed a complaint against TAG in North Carolina in which they alleged that State Street, like the plaintiffs, was a victim of TAG's purported fraud, and it argues that as a result, judicial estoppel defeats any claim that the defendant had knowledge of any false or misleading information contained in the account statements. (See Def. Reply Mem.

value the plaintiffs' assets, the Joint Account Agreement "does not clearly excuse [State Street] for supplying inaccurate statements or failing to verify their contents before passing them along to Plaintiffs, especially where, as alleged, [State Street] knew or should have known" that the statements contained false information. Burns v. Del. Charter Guar. & Trust Co., 805 F. Supp. 2d 12, 24 (S.D.N.Y. 2011). Therefore, this court concludes that there is an ambiguity in the Agreement as to whether, under the circumstances alleged in the complaint, the defendant violated a contractual duty to refrain from issuing inaccurate account statements.

Additionally, as the plaintiffs argue, "New York law implies in every contract a covenant of good faith and fair dealing pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dorset Indus., Inc. v. Unified Grocers, Inc., No. 11-CV-6337 (ADS) (GRB), 2012 WL 4470423, at *7 (E.D.N.Y. Sept. 27, 2012) (quotations and citations omitted). An alleged breach of that duty is not considered a separate cause

---

at 7-8). However, State Street has failed to provide any support for its contention that judicial estoppel is applicable here. In order for judicial estoppel to attach, two requirements must be met. See Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). "First, the estopping position and the estopped position must be directly inconsistent, that is mutually exclusive. Second, the responsible party must have succeeded in persuading the court to accept its prior position." Id. (internal citations omitted). Even if, as State Street asserts, the plaintiffs took a position that is inconsistent with the position they are taking here, the defendant has not provided any evidence that the plaintiffs persuaded the North Carolina court to accept their allegations. See Szulik v. TAG V.I., Inc., 858 F. Supp. 2d 532 (E.D.N.C. 2012) (ruling on motions to dismiss and to transfer venue without addressing any allegations concerning State Street or the custody accounts). Therefore, State Street's claim of judicial estoppel is without merit.

of action, but "is merely a breach of the underlying contract." Id. (quotations and

citations omitted).[8]  Because the defendant's alleged conduct in misleading the plaintiffs

about the value of assets contained in their custody accounts raises a factual issue as to

whether it failed to act in good faith in carrying out its custodial obligations, the plaintiffs

should have an opportunity to pursue their claim for breach of contract based on the

misreporting of asset values.

## Alleged Listing of Phony CUSIPs

This court also recommends that the Szuliks have an opportunity to pursue their

claim that State Street breached the Joint Account Agreement by listing phony CUSIP

numbers on the plaintiffs' account statements.  The plaintiffs allege, in support of this

claim, that a CUSIP number "is the hallmark of a legitimate domestic security," and that

State Street's decision to include phony CUSIP numbers for securities listed on the

plaintiffs' account statements misled them into believing that the assets in their accounts

were legitimate when, in fact, many of those assets consisted of nothing more than highly

speculative and illiquid securities and worthless promissory notes.  (See Compl. ¶¶ 17, 32-

33, 35-37).  For the reasons discussed above in connection with the alleged misreporting of

asset values, these allegations are sufficient to state a claim at this stage in the litigation.  In

particular, this court rejects State Street's argument that the plaintiffs' CUSIP claims are ill-

_____

[8]  Because a claim for breach of the implied duty of good faith and fair dealing is
equivalent to a breach of contract claim under New York law, the failure to state a separate claim
for breach of the implied covenant does not defeat the plaintiffs' assertion that State Street
breached an implied duty to act in good faith.

founded because the custodian was under no obligation to assign tracking numbers to the securities listed in the account statements or to do so in a particular way.  (See Def. Mem. at 15).  While the custodian may not have had an express duty to provide any type of tracking number, as described above, there is no language in the Joint Account Agreement which excuses the custodian's issuance of false and inaccurate account statements, or its failure to act in good faith.

The defendant's argument that the SEC recognizes the use of internal tracking numbers known as "dummy" CUSIPs to identify certain securities, also is unpersuasive. (See Def. Mem. at 15 n.9).  As an initial matter, there is no allegation that State Street's assignment of allegedly false CUSIP numbers to the plaintiffs' securities was done for internal tracking purposes.  Furthermore, even if it were assumed that State Street's inclusion of CUSIP numbers on the account statements was intended for such purposes, that would not alter the alleged fact that State Street's actions misled the plaintiffs about the true nature of the securities in their accounts.  Accordingly, the argument that the use dummy CUSIPs is a recognized practice, which may have been used in this case, is insufficient to defeat the plaintiffs' contract claim at this juncture.

Finally, dismissal is not warranted based on the State Street's assertion that "there is no substance to the conclusory allegation that listing a CUSIP number for certain assets conveyed 'that all of the Szuliks' holdings were legitimate securities.'"  (Def. Mem. at 15). In support of its argument, State Street relies on a statement from the website of CUSIP Global Services, the agency that issues CUSIP numbers for Standard & Poor's, warning

investors that the assignment of a CUSIP number should not be construed as an endorse-

ment of a security, a recommendation to buy, sell or hold a security, or an opinion

regarding the legal validity of a security.  (Id.).  However, State Street has not shown that

consideration of such evidence is appropriate on a motion to dismiss or that such a dis-

claimer is consistent with the general understanding in the industry as to the significance of

CUSIP numbers.  Therefore, this court recommends that the motion to dismiss be denied

with respect to the plaintiffs' claim that State Street breached the Joint Account Agreement

by listing phony CUSIP numbers on its clients' account statements.

### iv.     Claims Concerning Excessive Custodial Fees

State Street also has moved to dismiss the plaintiffs' claims that the defendant

breached the terms of the Custody Account Agreements by charging excessive custodial

fees based on inflated asset values.  For the reasons that follow, this court recommends that

the motion to dismiss these claims be denied.

The defendant argues, as an initial matter, that dismissal of the fee claims is appro-

priate because they are "premised on the misplaced notion that fees may only be assessed for

certain assets of Plaintiffs' choosing" rather than on the basis of a standard fee schedule

that was in effect from time to time.  (Id. at 16).  However, this argument appears to reflect

a misinterpretation of the plaintiffs' claims.  State Street is correct that under each of the

Custody Account Agreements, the custodian was authorized to assess fees based on a

custodian fee schedule that was in effect from time to time.  (See Compl. Ex. A ¶ 6; Compl.

Ex. B ¶ 18).  Nonetheless, the plaintiffs' allegations are not inconsistent with those

-45-

provisions.  The plaintiffs have not alleged that the fee schedule was inapplicable or that fees could be charged only for certain assets.  Rather they have alleged that under the fee schedule, the fee "was calculated as a percentage of the total assets held by State Street" in the Szuliks' accounts.  (Compl. ¶¶ 14, 41).  In light of the allegations that some of those assets were improperly overvalued, the logical inference is that the total value of the plaintiffs' accounts was inflated, and that State Street charged them excessive fees.  (See id. ¶¶ 42-44).

This court also rejects State Street's argument that the plaintiffs' fee claims "rest[] on the unfounded and conclusory presumption that notes past their maturity dates or obligations reflected in documents 'not in good form' have no value."  (Def. Mem. at 16 (quoting Compl. ¶¶ 42-43)).  The plaintiffs have alleged specific facts indicating that certain of the promissory notes in question were not in good form because they were unsigned or improperly signed by TAG rather than the maker of the note.  (Compl. ¶¶ 20-21, 32).  As described above, these allegations are sufficient to state a claim for breach of contract.  Moreover, at this juncture such allegations are sufficient to support a reasonable inference that the securities at issue had little if any value.  Thus, this court finds that dismissal is not warranted on this basis.

State Street further asserts that "any challenge to fees has been waived under the Raymond [Trust] and [Szulik Children Trust] Agreements insofar as the value of the assets upon which the fee was purportedly based (and the fee itself) was evident from the Plaintiffs' monthly statements."  (Def. Mem. at 16).  Again, this court disagrees with State

Street's position on this point.  As an initial matter, there is no indication that the account statements contained any listing or description of custodial fees.  Therefore, the plaintiffs cannot be deemed to have approved those fees as a result of their failure to object to the account statements.  Furthermore, even if the plaintiffs waived any right to challenge the market values of the individual assets listed in the account statements, they did not authorize State Street to miscalculate fees based on total account values that the defendant knew or should have known were artificially inflated.  The fact that the Szuliks released State Street from any liability for the misreporting of asset values does not excuse the defendant's alleged conduct in overcharging the plaintiffs for services performed under the Custody Account Agreements.  Accordingly, this court recommends that State Street's motion to dismiss be denied with respect to the excessive fee claims.

**v.**    **Causation**

The defendant contends that the contract claims must be dismissed because the plaintiffs' alleged losses were caused by TAG's investment decisions and not by State Street's alleged conduct in carrying out its custodial duties.  (Def. Mem. at 16-17).  It argues that the absence of any causal connection between the plaintiffs' losses and State Street's alleged conduct with respect to the issuance of account statements is particularly apparent because the transactions that caused the losses had already occurred by the time they were reported on the account statements.  (<u>Id.</u> at 17; Def. Reply Mem. at 8-9).  This court finds the question of causation raises issues of fact that cannot be resolved at this

-47-

stage in the litigation.  Therefore, State Street's motion to dismiss Counts I and II on these grounds should be denied.

In order to assert a claim for breach of contract, the plaintiffs must allege, among other things, that the defendant's breach caused them to suffer damage.  See Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 351 (D. Mass. 2011) (stating that in order to assert a claim for breach of contract in Massachusetts, plaintiffs must allege, among other things, that the breach caused them damage); Xpedior Creditor Trust v. Credit Suisse First Bos. (USA) Inc., 341 F. Supp. 2d 258, 271 (S.D.N.Y. 2004) (noting that plaintiff's breach of contract claim requires proof of a causal connection between the defendant's breach and its own damages).  Ordinarily, questions of causation "are appropriately handled at summary judgment or trial, not on a motion to dismiss."  Xpedior Creditor Trust, 341 F. Supp. 2d at 272; see also Curran v. City of Boston,  777 F. Supp. 116, 123 (D. Mass. 1991) ("The question of proximate cause is a question of fact, and this court will not base a motion to dismiss upon such an issue").  This case is no exception.

As discussed supra, the plaintiffs have alleged that State Street directly caused them to incur damages by charging excessive fees based on inflated asset values.  Moreover, while TAG's alleged misconduct was undisputably the primary cause of losses to the plaintiffs' custodial accounts, a factfinder could conclude that State Street's alleged actions contributed to those losses by enabling TAG to pursue its unauthorized practices unabated. See Levinson v. PSCC Servs., Inc., No. 3:09-CV-00269 (PCD), 2010 WL 5477250, at *16 (D. Conn. Dec. 29, 2010) (finding that custodian bank's actions could be the proximate

cause of the plaintiffs' losses if its alleged misconduct facilitated the fraud perpetrated by a third party and the fraud was a foreseeable risk of the custodian's actions).  In particular, a factfinder could determine that State Street's continued acceptance of defective and worthless promissory notes, without objection and without notification to the plaintiffs, enabled TAG to pursue its deceptive scheme unchecked.  Similarly, a factfinder could conclude that State Street's conduct in issuing misleading account statements perpetuated the alleged fraud by concealing information that may have alerted the plaintiffs about problems with their investments.  Therefore, at this point in the proceedings, the plaintiffs have alleged sufficient facts to show that State Street's alleged breach of its contractual obligations caused them to suffer damages.

### vi.    Effect of the Agreements' Exculpatory Clauses

Finally, this court does not agree with State Street's assertion that the exculpatory provisions of the Custody Account Agreements foreclose any claim for breach of contract. As described above, the exculpatory provisions of the Joint Account Agreement protect State Street from liability for any losses suffered by the plaintiffs "unless such loss is caused by [State Street's] negligence or willful misconduct," and the exculpatory provisions of the Raymond Trust and Szulik Children Trust Agreements protect State Street from liability from any losses suffered by the plaintiffs "unless such loss is caused by [State Street's] gross negligence or willful misconduct."[9]  (Compl. Ex. A ¶ 7; Compl. Ex. B

---

[9]  The plaintiffs' assertion that a negligence standard should apply to all causes of action asserted by the Raymond W. Szulik Trust is not supported by the record.  As an initial matter, the

¶ 16(B)).  However, this court finds that the alleged facts are sufficient to support a claim

that State Street's alleged breaches of contract were at least negligent or grossly negligent.

Therefore, the exculpatory provisions do not support dismissal.

In order to establish negligence for purposes of the Joint Account Agreement, the

plaintiffs must show that the defendant breached a duty of reasonable care that its owed to

the Szuliks.  See Ballard v. City of New York, 11 Misc. 3d 1014, 1016, 810 N.Y.S.2d 652,

655 (Sup. 2006) (setting forth elements of a negligence claim).  "Typically, whether

reasonable care was exercised is a question of fact."  Jones v. G & I Homes, Inc., 86 A.D.

3d 786, 788, 927 N.Y.S.2d 206, 208 (2011).  Gross negligence is defined as

> "an act or omission respecting [the] legal duty of an aggravated
> character as distinguished from a mere failure to exercise ordinary
> care. Altman v. Aronson, 231 Mass. 588, 591, 121 N.E. 505 (1919).
> It is "substantially and appreciably higher in magnitude than ordinary
> negligence." Id.; accord Matsuyama v. Birnbaum, 452 Mass. 1, 890
> N.E.2d 819 (2008).  It is defined as "indifference to a present legal
> duty and ... utter forgetfulness of legal obligations so far as other
> persons may be affected" and "very great negligence, or the absence of
> slight diligence, or the want of even scant care." Altman, 231 Mass. at

---

plaintiffs have alleged that State Street's breaches of the Raymond Trust Agreement occurred
through gross negligence or willful misconduct.  (Compl. ¶¶ 60-67).  Furthermore, the plaintiffs'
reliance on the last sentence of paragraph 16(B) of the Agreement to support its argument is
misplaced.  That sentence reads: "[t]he undersigned [custody account holder] agrees to indemnify
and hold you [the custodian] harmless from loss or liability (including reasonable attorney's fees)
arising out of or in any way related to the terms of this Agreement, unless caused by your
negligence or willful misconduct."  (Compl. Ex. B ¶ 16(B)).  Accordingly, the last sentence of
paragraph 16(B) concerns the plaintiffs' indemnification of the custodian, not the custodian's
potential liability for losses incurred by the Szuliks.  As detailed herein, the custodian's liability for
such losses is limited to losses caused by the custodian's "gross negligence or willful misconduct."
(Id.; see also Compl. Ex. B ¶ 13 (protecting custodian from liability for actions taken in
accordance with TAG's instructions unless its reliance on such instructions "is the result of your
gross negligence or willful misconduct")).

591, 121 N.E. 505.  However, "[i]t falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong."  *Id.*

Doe v. Cultural Care, Inc., Civil Action No. 10-11426-DJC, 2011 WL 4738558, at *3 (D. Mass. Oct. 7, 2011) (unpub. op.) (alterations and punctuation in original).  In evaluating whether a defendant's actions were grossly negligent, the court must consider the defendant's conduct as a whole.  Id.  Furthermore, "'[e]very act or omission . . . must be considered in connection with all the other circumstances before the whole can be properly held to amount to gross negligence.'"  Id. (quoting Driscoll v. Pagano, 313 Mass. 464, 468, 48 N.E.2d 11 (1943)).  Thus, the question whether a party's conduct was negligent or grossly negligent involves a fact-based inquiry into the circumstances of the case.

As detailed above, the plaintiffs have alleged facts showing that State Street wrongfully disbursed their funds in exchange for facially defective and worthless securities, misled the plaintiffs by deliberately listing phony CUSIP numbers on the plaintiffs' account statements, misled the plaintiffs by listing promissory notes at par value although the notes were worthless or had long been in default, and charged the plaintiffs' excessive fees based on inflated asset values.  These facts are sufficient not only to state a breach of contract claim, but also to create a question of fact as to whether State Street's actions reflected a lack of ordinary care or even a "want of . . . scant care."  Accordingly, it would not be appropriate to dismiss the breach of contract claims based on the language of the exulpatory provisions.

### D.    Count III: Claim for Negligence

Pursuant to Count III of their complaint, the plaintiffs are seeking to hold State Street liable under a theory of negligence.  Specifically, they claim that the defendant breached the duty of care that it owed to the Szuliks by disbursing their funds in exchange for securities that were not in good form as a matter of law and accepted business usage; disbursing their funds for the purpose of purchasing stock that was not transferred to their accounts on a timely basis; disbursing their funds in connection with facially irregular transactions;  disbursing their funds without taking custody of the securities purchased or depositing those securities with an appropriate sub-custodian; improperly reporting the value of the assets in their custody accounts; listing phony CUSIP numbers on their account statements; and charging the plaintiffs excessive custodial fees on the basis of inflated asset values.  State Street has moved to dismiss these claims on the grounds that they are barred by the economic loss doctrine and the exculpatory clauses of the Raymond Trust and Szulik Children Trust Agreements, are duplicative of the plaintiffs' breach of contract claims, and are time-barred insofar as they are based on transactions that occurred prior to January 4, 2009.  (Def. Mem. at 18-21).  For the reasons that follow, this court recommends that the motion to dismiss Count III be denied, except that the trustees of the Raymond Trust and the Szulik Children Trusts may only proceed with claims based on gross negligence; ordinary negligence is not sufficient.

## The Economic Loss Doctrine

Both Massachusetts and New York law preclude liability for tort claims where the plaintiff is seeking recovery for purely economic losses.[10]  See Burns, 805 F. Supp. 2d at 25 ("New York courts restrict plaintiffs who have suffered economic loss, but not personal or property injury, to an action for the benefits of their bargain.  Thus, if the damages suffered are of a type remediable in contract, a plaintiff may not recover in tort" (quotations, citations, and punctuation omitted)); Arthur D. Little Int'l, Inc. v. Dooyang Corp., 928 F. Supp. 1189, 1202 (D. Mass. 1996) ("Under longstanding Massachusetts law, purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage."  (quotations and citations omitted)).  In cases such as this one, where the parties' relationship is governed by contract, "the economic loss doctrine protects [the] parties' abilities to allocate risk by mutual agreement and thereby form reliable expectations about their potential financial exposure with respect to the duties and liabilities that they have contractually assumed."  Burns, 805 F. Supp. 2d at 25 (quotations and citations omitted); accord Arthur D. Little Int'l, Inc., 928 F. Supp. at 1202.  Ordinarily, therefore, "[w]here plaintiffs allege primarily economic loss as an injury in a tort claim, the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie."  Burns, 805 F. Supp. 2d at 25 (internal quotation omitted).

_____

[10]  The parties have not engaged in a choice of law analysis, but instead have assumed for purposes of the instant motion that New York and Massachusetts law govern the plaintiffs' claims for negligence, unjust enrichment and breach of fiduciary duty. Accordingly, this court has relied on case law from both jurisdictions in connection with its analysis of these claims.

Despite their reliance on the economic loss doctrine, both Massachusetts and New York courts will uphold tort claims to recover economic losses caused by the negligent breach of a contractual obligation.  See Burns, 805 F. Supp. 2d at 25 (explaining that breach of a duty of reasonable care in the performance of contract obligations will give rise to a tort claim); Arthur D. Little Int'l, Inc., 928 F. Supp. at 1203 ("this Court concludes that Massachusetts law permits a cause of action to recover economic losses caused by negligent breach of a contractual duty").  "'Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort.'"  Anderson v. Fox Hill Vill. Homeowners Corp., 424 Mass. 365, 368, 676 N.E.2d 821, 823 (1997) (citations omitted).  As the court explained in Burns,

> "[a] defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations.  The very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim.  Where a party has fraudulently induced the plaintiff to enter into a contract, it may be liable in tort, or where a party engages in conduct outside the contract but intended to defeat the contract, its extraneous conduct may support an independent tort claim.  Conversely, where a party is merely seeking to enforce its bargain, a tort claim will not lie."

Burns, 805 F. Supp. 2d at 25-26 (quoting N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y. 2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (N.Y. 1995)) (alteration omitted)).

Significantly, in the instant case, the Custody Account Agreements carve out claims of negligence and gross negligence from their coverage.  Specifically, paragraph 7 of the Joint Account Agreement provides that "[y]ou [the custodian] shall not be liable . . . for any loss suffered by the undersigned . . . in connection with, arising out of, or in any way related to the transactions contemplated under this Agreement, unless such loss is caused by your negligence or willful misconduct."  (Compl. Ex. A ¶ 7).  Similarly, paragraph 16(B) of the Raymond Trust and Szulik Children Trust Agreements provides that "[y]ou [the custodian] shall not be liable . . . for any loss suffered by the undersigned . . . in connection with, arising out of, or in any way related to the transactions contemplated under this Agreement, unless such loss is caused by your gross negligence or willful misconduct." (Compl. Ex. B ¶ 16(B)).  Therefore, tort claims based in negligence (in the case of the Joint Account Agreement) or gross negligence (in the case of the Raymond Trust and Szulik Children Trust Agreements) "seek to enforce duties outside of the contract and cannot be precluded by Plaintiffs' contract claims." Burns, 805 F. Supp. 2d at 26. Moreover, as described above, "the purpose of the economic loss doctrine is to allow parties to allocate risk." Id.  In light of the parties' agreement to exclude claims for negligence and gross negligence from their contracts, "it would be improper to apply the economic loss doctrine to dismiss Plaintiffs' tort claims."[11] Id.

_____

[11] As the plaintiffs correctly note, Massachusetts courts have declined to apply the economic loss doctrine to tort claims against a fiduciary.  See Clarke v. Rowe, 428 Mass. 339, 342, 701 N.E.2d 624, 626 (1998) ("We have not applied the economic loss rule to claims of negligence by a fiduciary").  However, as detailed infra, this court finds that the plaintiffs have

**Sufficiency of Claims**

The next question raised by State Street's motion to dismiss is whether the plaintiffs' negligence claims fail as a matter of law because they are entirely duplicative of the breach of contract claims, and the plaintiffs have neglected to identify any duty to act outside of the duties set forth in the parties' contracts.  (See Def. Mem. at 19-20; Def. Reply Mem. at 11).  As described above, tort claims require a showing that the defendant breached a duty of care distinct from its contractual duties.  See Anderson, 424 Mass. at 368, 676 N.E.2d at 823 ("failure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made").  Here, the plaintiffs have based their negligence claims on the same conduct that serves as the basis for their breach of contract claims.  However, this does not require dismissal at this juncture in the proceedings.

"At this stage of the litigation, alternative pleading is entirely permissible."  Int'l Envtl. Mgmt., Inc. v. Envirotron, Ltd., 724 F. Supp. 2d 230, 239 (D. Mass. 2010) (quotations, citations, and alteration omitted).  In fact, the Federal Rules of Civil Procedure expressly allow it.  See Fed. R. Civ. 8(a)(3) and 8(d)(3).  As the exculpatory provisions of the parties' contracts demonstrate, State Street unambiguously accepted liability for its own negligence under the Joint Account Agreement, and for its own gross negligence under the remaining Agreements.  Even if the plaintiffs are unable to show that State Street's conduct

---

failed to allege the existence of a fiduciary relationship between the parties.  Therefore, the fiduciary exception to the economic loss rule does not apply in this case.

amounted to a failure to perform a contractual duty, they may be able to show that State Street breached the duty of care that it owed to the Szuliks in the course of carrying out its custodial duties.  Therefore, the Szuliks should have an opportunity to pursue their claims for negligence as well as their breach of contract claims.

### Limitations on Negligence Claims

State Street also argues that any claim for simple negligence by the trustees of the Raymond Trust and the Szulik Children Trusts is barred by the exculpatory language of the Raymond Trust Agreement and the Szulik Children Trust Agreements.  (Def. Mem. at 19).  Where, as in the instant matter, "'the language of the exculpatory agreement expresses in unequivocal terms the intention of the parties to relieve a defendant of liability for the defendant's negligence, the agreement will be enforced.'"  Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *11 (S.D.N.Y. Dec. 22, 2003) (citation omitted); see also Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council, 416 Mass. 286, 288, 620 N.E.2d 784, 786 (1993) (enforcing terms of release under which defendant exempted itself from liability for its own negli-gence).  Thus, the trustees of the Raymond Trust and the Szulik Children Trusts may not pursue claims for ordinary negligence.

As described above, the exculpatory provisions do not preclude the trustees from seeking to hold State Street liable for gross negligence.  Therefore, although the trustees may not proceed on a claim for ordinary negligence, they may pursue claims that State

Street breached its duty of care by acting with gross negligence in carrying out its custodial responsibilities.

**<u>Timeliness</u>**

State's Street final challenge to the negligence claims is that they are untimely to the extent they are based on transactions that occurred prior to January 4, 2009.  (Def. Mem. at 20-21).  "Affirmative defenses, such as the statute of limitations, may be raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), provided that the facts establishing the defense [are] clear on the face of the plaintiff's pleadings."  <u>Santana-Castro v. Toledo-Davila</u>, 579 F.3d 109, 113-14 (1st Cir. 2009) (alteration in original) (quotations and citations omitted).  "Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to sketch a factual predicate that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate."  <u>Id.</u> at 114 (quotations and citations omitted).  For the reasons that follow, the complaint in the instant case alleges sufficient facts to render dismissal on statute of limitations grounds inappropriate.

It is undisputed that claims for negligence are subject to a three-year statute of limitations under both Massachusetts and New York law.  <u>See</u> <u>Arthur D. Little Int'l, Inc.</u>, 928 F. Supp. at 1203 ("In Massachusetts, 'actions in tort . . . shall be commenced only within three years next after the cause of action accrues'" (quoting Mass. Gen. Laws ch. 260, § 2A)); <u>Samuel L. Hagan II, P.C. v. J.P. Morgan Chase Bank, N.A.</u>, 33 Misc. 3d 1211(A), 939 N.Y.S.2d 744, 2011 WL 4975311 at *3-4 (N.Y. Sup. Ct. Oct. 19, 2011)

(three-year statute of limitations applies to plaintiff's negligence cause of action for money damages). Because the complaint in the instant case was filed on January 4, 2012, any negligence claims that accrued prior to January 4, 2009 must be deemed untimely.

As State Street points out, the complaint challenges conduct and transactions that occurred at various times from approximately 1996 until 2009, when TAG was employed by the Szuliks as their investment manager. (See Compl. ¶¶ 7, 17). Therefore, the Szuliks must allege facts showing that their negligence claims accrued after January 4, 2009 or that the statute of limitations was otherwise tolled.

This court finds that the plaintiffs have alleged sufficient facts to avoid dismissal at this juncture in the case. "The usual rule [in Massachusetts] is that a cause of action in tort accrues at the time the plaintiff sustains some injury as the result of a wrongful act on the part of the defendant." Arthur D. Little Int'l, Inc., 928 F. Supp. at 1203. "However, if the injury or its cause was not immediately apparent, the 'discovery rule' applies and the cause of action does not accrue until the plaintiff knew or could have known of both the injury and the cause of the injury." Id. (citations omitted). Here, the plaintiffs allege that State Street concealed the true nature of securities in their custody accounts by listing false and misleading information on the plaintiffs' account statements. (See Compl. ¶¶ 17, 31-33, 36-37). Consequently, State Street allegedly misled the plaintiffs into believing that their investments were legitimate when, in fact, they consisted of illiquid, high risk and worthless assets. (See id. ¶¶ 17, 32, 36). The plaintiffs further allege that State Street finally acknowledged a problem with their accounts beginning in February 2010, when the

defendant notified its clients that information on "held at source assets was not provided or verified for accuracy by State Street" and was being displayed "for informational purposes only." (Id. ¶ 34).  Thus, the complaint supports an inference that the plaintiffs were unaware of their alleged injuries, and could not have known about them, prior to February 2010.[12]

These same allegations also are sufficient at this stage to support a claim for equitable tolling.  "Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances." Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996).  Thus, the doctrine of equitable tolling may be applied "'as a matter of fairness where the plaintiff has been 'prevented in some extraordinary way from exercising his rights, or has asserted his rights in the wrong forum.'" Id. (quoting Miller v. Int'l Tel. & Tel. Corp., 755 F. 2d 20, 24 (2d Cir. 1985)) (punctuation omitted). The plaintiffs' claim that State Street concealed critical information about their accounts by misrepresenting the value and legitimacy of assets contained in those accounts raises a question of fact as to whether, in fairness, the three-year statute of limitations should be tolled.  Accordingly, this court recommends that the motion to dismiss Count III on statute of limitations grounds be denied.

### E.   Count IV: Claim for Unjust Enrichment

---

[12]  State Street argues, based on facts that the Szuliks alleged in their complaint against TAG in North Carolina, that the plaintiffs were aware of TAG's unauthorized investments as early as mid-to-late 2008.  (Def. Reply Mem. at 13).  As described in note 7 supra, State Street has failed to show that the North Carolina complaint is controlling here.

The plaintiffs claim, in Count IV of their complaint, that State Street was unjustly enriched by its retention of custodian fees that were excessive because they were calculated based on asset values that had been inflated by the inclusion of defaulted promissory notes and securities that were obviously defective and not in good form.  State Street contends that this claim cannot stand because the plaintiffs have an adequate remedy at law and because the plaintiffs have not alleged any inequitable conduct.  (Def. Mem. at 21-22).  This court disagrees and recommends that the motion to dismiss be denied with respect to Count IV of the complaint.

State Street argues that the claim for unjust enrichment must fail because such equitable claims are precluded by the existence of the parties' contractual agreements.  (Id. at 21).  The defendant's argument reflects an accurate statement of the law.  See Grund v. Del. Charter Guar. & Trust Co., 788 F. Supp. 2d 226, 251 (S.D.N.Y. 2011) (ruling that "the existence of a valid and enforceable contract governing a particular subject matter precludes recovery for unjust enrichment arising out of the same subject matter"); Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 29 (D. Mass. 2006) (dismissing unjust enrichment claim where parties' relationship was governed by a valid, express contract).  However, it does not necessarily follow that this claim must be dismissed.  As described above, "the Federal Rules explicitly permit a party to plead causes of action in the alternative, 'regardless of consistency.'"  Xpedior Creditor Trust, 341 F. Supp. 2d at 272 (quoting Fed. R. Civ. P. 8(e)); see also Smith v. Jenkins, 626 F. Supp. 2d 155, 170 (D. Mass. 2009) (denying motion to dismiss unjust enrichment claim despite the parties'

contractual relationship).  Although the existence of a contractual relationship may

ultimately bar the unjust enrichment claim, it does not warrant the dismissal of that claim at

this point in the litigation.

This court also finds that the plaintiffs have adequately alleged inequitable conduct

with respect to the fees assessed.  As described above, the plaintiffs have alleged facts

showing that the defendant based its custodial fees on artificially inflated account values,

and that as a result, the plaintiffs were overcharged for State Street's services.  Therefore,

Count IV should survive State Street's motion to dismiss.

### F.   Count V: Breach of Fiduciary Duty

In their final Count of the complaint, the plaintiffs claim that State Street owed them

fiduciary duties, and that it breached those duties by engaging in the same activities that

form the basis for their breach of contract and negligence claims.  "To satisfy the elements

of a claim for breach of fiduciary duty, the plaintiff must allege four elements: '(1) exis-

tence of a fiduciary duty arising from a relationship between the parties, (2) breach of that

duty, (3) damages, and (4) a causal relationship between the breach and the damages.'"

Kriegel v. Bank of Am., N.A., Civil Action Nos. 07cv12246-NG, 08cv11598-NG, 2010

WL 3169579, at *12 (D. Mass. Aug. 10, 2010) (citation omitted); see also Musalli Factory

For Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 26 (S.D.N.Y. 2009)

("To plead a claim of breach of fiduciary duty successfully under New York law, a plaintiff

must demonstrate both a fiduciary relationship between the parties and a breach of the duty

implied in connection with such a relationship"), aff'd, 382 F. App'x 107 (2d Cir. 2010).

Because this court finds that the Szuliks have failed to allege facts supporting the existence of a fiduciary relationship, this court recommends that Count V of the complaint be dismissed.

The plaintiffs allege, in support of their claim, that State Street owed them fiduciary duties "as a result of it taking custody of their assets." (Compl. ¶ 84). However, "the relationship between a bank and its customer is generally one of debtor and creditor and does not itself, without more, establish a fiduciary duty." Olson v. Sovereign Bancorp, Inc., Civil Action No. 08-10471-GAO, 2012 WL 642543, at *3 (D. Mass. Feb. 28, 2012); accord Musalli Factory For Gold & Jewellry, 261 F.R.D. at 26. The fact that State Street maintained custody of the Szuliks' assets is insufficient to establish the existence of a fiduciary relationship. See Olson, 2012 WL 642543, at *3 (finding no evidence of a fiduciary relationship between the plaintiff and its custodian bank).

The plaintiffs nevertheless contend that a fiduciary duty arose because they reposed trust in State Street, and the defendant had greater knowledge than the Szuliks of facts relating to their assets. (Pl. Opp. Mem. at 23). "A fiduciary duty exists 'when one reposes faith, confidence, and trust in another's judgment and advice.'" Doe v. Harbor Sch., Inc., 446 Mass. 245, 252, 843 N.E.2d 1058, 1064 (2006) (quoting Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509, 516, 633 N.E.2d 424 (1994)) (additional citation omitted); see also In re Enron Corp., 292 B.R. 752, 786 (Bankr. S.D.N.Y. 2003) (explaining that a fiduciary relationship may be found where the plaintiff reposes trust and confidence in the defendant, and the defendant "is under a duty to act for or to give advice

for the benefit of [the plaintiff] upon matters within the scope of the relation").  "However,

unilateral trust or confidence does not automatically create a fiduciary relationship; the

trust or confidence must be accepted as well."  Musalli Factory For Gold & Jewellry, 261

F.R.D. at 26; accord Kriegel, 2010 WL 3169579, at *12.

Here, the plaintiffs have not alleged any facts showing that they reposed trust and

confidence in State Street's judgment or advice, or that State Street accepted the plaintiffs'

confidence.  Although the plaintiffs allege that they entered into custodial agreements with

State Street in order "[t]o safeguard their assets from misappropriation and/or misuse by

TAG" (Compl. ¶ 8; see also Compl. ¶¶ 9, 11, 13), the record does not support such a claim.

The complaint establishes that the parties' relationship was based on the Custody Account

Agreements.  Those Agreements demonstrate that while State Street was authorized to hold

and dispose of property and investments in accordance with TAG's instructions, it was to

have no duty or responsibility to supervise, make recommendations, or advise the Szuliks

with respect to their investments, or with respect to the purchase, sale or retention of any

property held in their custody accounts.  (See Compl. Ex. A ¶ 13; Compl. Ex. B ¶ 16(A)).

Therefore, the record demonstrates that it was TAG, not State Street, who was given

discretion to order disbursements from the plaintiffs' custody accounts and to make

investment decisions on their behalf, and that it was TAG who accepted the Szuliks' trust

and confidence.[13]  See Musalli Factory For Gold & Jewellry, 261 F.R.D. at 26 (finding no

---

[13]  The plaintiffs' reliance on Pearson v. United States, 831 F. Supp. 2d 514 (D. Mass. 2011) is misplaced.  There the court determined that under Massachusetts law, a fiduciary

fiduciary duty between plaintiff and defendant bank where it was a third party "which

served as [plaintiff's] investment advisor and thereby accepted [plaintiff's] trust and

confidence").  Under the circumstances presented here, where the defendant's relationship

with the Szuliks was purely contractual, the defendant owed no fiduciary duties to the

plaintiffs.  See Kriegel, 2010 WL 3169579, at *14 (finding no fiduciary duty where bank

had no discretion to make investment decisions, and its ability and obligation to act was

limited by its contract with the plaintiffs); see also Sekerak v. Nat'l City Bank, 342 F.

Supp. 2d 701, 712 (N.D. Ohio 2004) (finding that bank owed plaintiff no fiduciary duties

under custody agreement where investment advisor was given discretion to make

investment decisions for plaintiff's account, and bank's duties were largely administrative).


     The plaintiffs' argument that the existence of a fiduciary duty is ordinarily a factual

question is not enough to support a claim.  The plaintiffs still must allege facts to show the

existence of a fiduciary relationship.  See Kriegel, 2010 WL 3169579, at *13 (dismissing

claim for breach of fiduciary duty where "the contractual language suggests that plaintiffs'

position that a fiduciary relationship existed is unreasonable"); Musalli Factory For Gold &

Jewellry, 261 F.R.D. at 26 (noting that claim for breach of fiduciary duty "usually involves

---

relationship existed between the plaintiff and the Federal Deposit Insurance Corporation in the
context of a foreclosure sale. Pearson, 831 F. Supp. 2d at 519-20.  As the court stated,
"Massachusetts courts have determined that one such instance in which a fiduciary duty arises
between a lender and a borrower is in the context of a foreclosure sale." Id. at 519.  No such
scenario is presented in the present case.

a question of fact," but dismissing claim where plaintiff failed to allege facts to establish a fiduciary relationship).  Even when all reasonable inferences are drawn in the Szuliks' favor, the complaint fails to show that State Street was acting in a fiduciary capacity. Accordingly, the plaintiffs' claim for breach of fiduciary duty should be dismissed.

## IV.  **CONCLUSION**

For all the reasons detailed above, this court recommends to the District Judge to whom this case is assigned that "Defendant State Street Bank and Trust Company's Motion to Dismiss Plaintiffs' Complaint" (Docket No. 14) be ALLOWED IN PART and DENIED IN PART.[14]  Specifically, this court recommends as follows:

(A)    With respect to Count I asserting claims for breach of the Joint Account Agreement between the defendant and Matthew and Kyle Szulik, this court recommends that the motion to dismiss be ALLOWED as to:

---

[14]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).

(1)     allegations that State Street disbursed funds for the purpose of purchasing shares of stock that were not transferred to the Joint Custodial Account on a timely basis;

(2)     allegations that State Street disbursed funds without taking custody of securities received in exchange or entrusting those securities to a qualified and suitably independent subcustodian; and

(3)     allegations that State Street disbursed the Szuliks' funds in connection with facially irregular transactions.

However, this court recommends that the motion to dismiss Count I be DENIED with respect to the following:

(4)     allegations that State Street disbursed funds in exchange for securities that were not in good form as a matter of law or accepted business usage;

(5)     allegations that State Street misreported the value of the plaintiffs' assets;

(6)     allegations that State Street listed phony CUSIP numbers on the plaintiffs' account statements; and

(7)     allegations that State Street charged excessive custodial fees on the basis of inflated asset values.

(B)     With respect to Count II asserting claims for breach of the Raymond Trust Agreement and the Szulik Children Trust Agreements, this court recommends that the motion to dismiss be ALLOWED as to the following:

(1)     allegations that State Street disbursed funds for the purpose of purchasing shares of stock that were not transferred to the plaintiffs' custody accounts on a timely basis;

(2)     allegations that State Street disbursed funds without taking custody of securities received in exchange or entrusting those securities to a qualified and suitably independent subcustodian;

-67-

(3)     allegations that State Street disbursed the Szuliks' funds in connection with facially irregular transactions;

(4)     allegations that State Street misreported the value of the plaintiffs' assets; and

(5)     allegations that State Street listed phony CUSIP numbers on the plaintiffs' account statements.

However, this court recommends that the motion to dismiss Count II be DENIED with respect to:

(6)     allegations that State Street disbursed funds in exchange for securities that were not in good form as a matter of law or accepted business usage; and

(7)     allegations that State Street charged excessive custodial fees on the basis of inflated asset values.

(C)     With respect to the negligence claims asserted against State Street in Count III, this court recommends that the motion to dismiss be DENIED.  However, this court further recommends that the trustees of the Raymond Trust and the Szulik Children Trusts be limited to claims for gross negligence, as opposed to ordinary negligence.

(D)     With respect to the unjust enrichment claims asserted in Count IV, this court recommends that the motion to dismiss be DENIED.

(E)     With respect to the claims for breach of fiduciary duty asserted in Count V, this court recommends that the motion to dismiss be ALLOWED.

    / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge

-68-